MATTHEW D. RIFAT (SBN 187882)
**Law Offices of Matthew D. Rifat, APC**
Post Office Box 19879
San Diego, California 92159
Telephone: (619) 708-3675
email: matthew.rifat@lomdr.com

Attorneys for Plaintiff
People of the State of California, *ex rel.*,
San Diego Comprehensive Pain Management Center, Inc.
and
Pacific Surgical Institute of Pain Management, Inc.

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN DIEGO

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.*, SAN DIEGO COMPREHENSIVE PAIN MANAGEMENT CENTER, INC., a California professional corporation' PACIFIC SURGICAL INSTITUTE OF PAIN MANAGEMENT, INC., a California corporation,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>JAYSEN EISENGREIN, an individual; SANDRA LOVE, an individual; and DOES 1 through 200, inclusive,<br><br>*Defendant.* | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF CALIFORNIA INSURANCE FRAUDS PREVENTION ACT AND VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**<br><br>**FILED IN CAMERA AND <u>UNDER SEAL</u> PURSUANT TO SECTION 1871.7(e)(2) OF THE CALIFORNIA INSURANCE CODE**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs People of the State of California *ex rel.* SAN DIEGO COMPREHENSIVE PAIN MANAGEMENT CENTER, INC., a California professional corporation, and PACIFIC SURGICAL INSTITUTE OF PAIN MANAGEMENT, INC., a California corporation, complain of Defendants JAYSEN EISENGREIN, an individual; SANDRA LOVE, an individual; and DOES 1 through 200, inclusive, and for causes of action allege as follows:

## INTRODUCTION

1. This action arises from a fraud scheme designed and carried out by the Defendants, who are executives at Qlarant Intergrity Solutions, LLC to unfairly and fraudulently oppose claims

LAW OFFICES OF MATTHEW D. RIFAT, APC
POST OFFICE BOX 19879
SAN DIEGO, CALIFORNIA 92159
(619) 708-3675

LAW OFFICES OF MATTHEW D. RIFAT, APC
POST OFFICE BOX 19879
SAN DIEGO, CALIFORNIA 92159
(619) 708-3675

for compensation for Medicare beneficiaries. Qlarant is a purportedly non-profit organization tasked with, among other things, investigations of allegations of fraud and abuse in the Medicare and related health insurance programs and have the authority to direct the suspension of medical providers resulting in the indefinite suspension of billions of dollars in reimbursement due to healthcare providers for legitimate medical services provided to insured patients.

2. Although Qlarant, which is paid annually more than $56 million and has assets of more than $10 million, presents itself as a "non-profit", in truth, the profits are routed to individuals including the defendants. Thus, for example, Defendant Love is paid nearly $400,000 in an annual salary and considerable fringe and other benefits and Defendant Eisengrein is paid nearly $250,000 in annual salary alone. Its top executives receive collectively nearly $3 million in annual salaries alone.

3. While there are genuine instances of health care fraud, waste and abuse which Qlarant has pursued, to sustain its existence on a massive scale, its executives target innocent medical providers and contrive allegations of fraud that have no basis in fact. Defendants Love and Eisengrein, among others, are engaged in a conspiracy to fraudulently deny valid claims for medical benefits. Eisengrein, in conspiracy with Defendant Love and others, has presented or caused to be presented knowingly false or fraudulent written or oral material statements in opposition to a claim for compensation for the purpose of denying compensation.

4. At all times herein relevant, the Defendants knowingly engaged in the conduct described. Their conduct was not the result of mistake, inadvertence or neglect it was and is intentional conduct.

5. As a direct result of the conduct of the Defendants, and each of them, false and fraudulent statements in opposition to claims have been made, and continue to be made, against claims for medical benefits. As a direct result of the conduct of the Defendants, Plaintiffs has been defrauded within the meaning of California Penal Code sections 549 and 550(b)(1)-(3). Accordingly, Plaintiffs bring this action on its own behalf as well as on behalf of the People of the State of California to recover penalties and assessments pursuant to section 1871.7 of the California Insurance Code and to enjoin, deter, and/or prevent Defendants from engaging in such conduct in the future

under section 1871.7 of the California Insurance Code and section 17200 of the California Business & Professions Code.

6. Defendants' conduct was and is in direct violation of California law, including, but not limited to sections 118, 127, 186.2, 549 and 550 of the Penal Code, the California Insurance Fraud Prevention Act codified in section 1871.7 of the Insurance Code, and California's Unfair Competition Law codified in section 17200 of the Business & Professions Code.

7. The claims herein involve illegal conduct on the part of the Defendants directed against San Diego Comprehensive Pain Management Center, Inc. This Plaintiff has been a provider of pain management services in San Diego for more than two decades—serving vulnerable patients in chronic pain who have no recourse to other providers. Among other treatment modalities provided by the Plaintiff is intrathecal pump treatment in which a device is implanted into a patient with chronic pain which delivers a continuous infusion of pain medication to a targeted area of the spinal cord. Unlike oral opioids which may produce effects beyond analgesia (like euphoria or a "high"), IT delivered medications have no such effects. They have proven extremely effective in patients who have tried and failed to treat their pain with other alternatives. In most instances, the IT treatment restores patients to their regular lives, with pain control and a restoration of the ability to function. In the Plaintiff's medical practice, it has converted bedridden patients into individuals who are able to exercise, walk miles a day, return to families, and engage in activities they never through possible.

8. Plaintiff San Diego Comprehensive's physicians perform surgeries at Pacific Surgical Institute of Pain Management, Inc, which includes implantation of medical devices that facilitate IT treatment.

9. IT treatment is expensive, relative to other pain treatment modalities. However, the cost of IT treatment is significantly less than the lost productivity and cost of inferior treatment. It is for this reason that the Defendants have targeted the modality as something to be squashed.

10. The Plaintiffs are reimbursed for its medical services by third party payors and by patients who pay directly for the services. Among other third party payors is Medicare. The plurality of the patients in Plaintiffs medical practice and surgery center are Medicare beneficiaries and, if

LAW OFFICES OF MATTHEW D. RIFAT, APC
POST OFFICE BOX 19879
SAN DIEGO, CALIFORNIA 92159
(619) 708-3675

there is disruption in Medicare reimbursement, it causes a catastrophic financial impact on the Plaintiffs. And, indeed, that is what the Defendants count on. By financially incapacitating a medical provider, the Defendants' fraudulent denials of claims go unchallenged and their scheme of living off the "fraud" industry continues unchecked.

11. On or about September 9, 2021, without notice or explanation, the Plaintiffs' Medicare payments stopped and was later determined to be a result of the Defendants' direction that Plaintiffs not be paid for its services to insured patients.

12. Plaintiff immediately challenged Defendants' conduct. On February 8, 2022, Plaintiff San Diego Comprehensive received correspondence from Defendant Eisengrein, asserting that all of its claims for insurance reimbursement from and after September 9, 2021 (now totaling well over $1 million) would not be paid because of supposed fraud. Attached hereto and incorporated herein by reference is Defendant Eisengrein's Correspondence, dated February 8, 2022 (**Exhibit "A"**). In truth, the assertion in the correspondence and the contentions it contains are themselves fraudulent denials of valid claims in violation of California law, as explained, in part, in the Plaintiff San Diego Comprehensive's February 25, 2022 response to Defendant Eisengrein's correspondence. Attached hereto and incorporated herein by reference is Plaintiff San Diego Comprehensive's Response Correspondence, dated February 25, 2022 (**Exhibit "B"**).

13. On February 25, 2022, Plaintiff Pacific Surgical Institute of Pain Management, Inc. received correspondence from Defendant Eisengrein, asserting that all of its claims for insurance reimbursement from and after September 9, 2021 (now totaling well over $1 million) would not be paid because of supposed fraud. Attached hereto and incorporated herein by reference is Defendant Eisengrein's Correspondence, dated February 25, 2022 (**Exhibit "C"**). In truth, the assertion in the correspondence and the contentions it contains are themselves fraudulent denials of valid claims in violation of California law, as explained, in part, in the Plaintiff Pacific Surgical's March 31, 2022 response to Defendant Eisengrein's correspondence. Attached hereto and incorporated herein by reference is Plaintiff Pacific Surgical's Response Correspondence, dated February 25, 2022 (**Exhibit "D"**).

LAW OFFICES OF MATTHEW D. RIFAT, APC
POST OFFICE BOX 19879
SAN DIEGO, CALIFORNIA 92159
(619) 708-3675

14. The Plaintiff is separately proceeding with its administrative remedies under federal law to remedy its suspension and withholding of reimbursement. This action seeks solely to remedy the fraudulent denial of valid claims for health benefits under the Insurance Fraud Prevention Act and related state law and seeks recovery of the IFPA's provision for penalties, assessments, and injunctive relief. This is not an action for compensation for damages or to recoup fraudulently withheld payments. The fraudulent denial of claims is not within any authority granted to the Defendants under Federal law.

**JURISDICTION AND VENUE**

15. The California Insurance Frauds Prevention Act, Article 1, sections 1871, *et seq.* empowers and encourages any interested person, including medical providers such as Plaintiff, to bring a civil action under section 1871.7 of the Insurance Code against those who have presented or caused to be presented knowingly false or fraudulent written or oral material statements in opposition to a claim for compensation for the purpose of denying compensation.

16. A complaint brought pursuant to section 1871.7 is required to be filed in camera and under seal for sixty (60) days to allow the government to conduct its own investigation without the knowledge of the defendants, and to determine whether to join in the suit. Further, a copy of the complaint and written disclosure of substantially all material evidence shall be served on the District Attorney of the county in which the matter is filed and Insurance Commissioner of the State of California. Plaintiff has complied or will have complied with these requirements when the Complaint is unsealed. Simultaneously with the filing of the Complaint in this action, Plaintiff provided written disclosure of substantially all material evidence regarding the allegations contained in the Complaint to the San Diego County District Attorney's Office and to the Office of the Insurance Commissioner of the State of California.

17. The Plaintiff named herein is an original source for all of the information contained in this Complaint as defined by section 1871.7 of the California Insurance Code. Plaintiff has direct and independent knowledge of the information on which the allegations contained herein are based, and has voluntarily provided this information to the District Attorney and Insurance Commissioner before

LAW OFFICES OF MATTHEW D. RIFAT, APC
POST OFFICE BOX 19879
SAN DIEGO, CALIFORNIA 92159
(619) 708-3675

filing the present action or at the time of its filing. Through its own investigation and expenditure of resources, Plaintiff has contributed to exposing Defendants' fraudulent schemes. Moreover, Plaintiff is a direct victim to the extent it has received false and fraudulent communications intended to deny valid claims for benefits under policies of insurance and had determined that Defendants' fraud has been perpetrated on it.

18. Plaintiff, Plaintiff's patients, and the State of California were and are the direct victims of the illegal and fraudulent schemes conducted by the Defendants, and each of them.

19. This Court has jurisdiction over the subject matter of this civil action pursuant to Article VI, section 10 of the California Constitution; section 1871.7 of the Insurance Code and section 17200 of the Business & Professions Code.

20. Jurisdiction over the person and venue are proper because the Defendants can be found in, transact and transacted business in and/or maintain offices in San Diego County and, while in the County of San Diego, engaged in illegal and fraudulent conduct proscribed by sections 118, 127, 186.2, 549 and 550 of the Penal Code, the California Insurance Fraud Prevention Act codified in section 1871.7 of the Insurance Code, and California's Unfair Competition Law codified in section 17200 of the Business & Professions Code.

21. Venue in this judicial district is appropriate pursuant to section 395(a) of the California Code of Civil Procedure.

22. This action does not seek a determination of any right or liability arising out of or incidental to a Medicare provider's suspension and does not seek compensatory damages.

**PARTIES**

23. Plaintiff San Diego Comprehensive Pain Management Center, Inc. is a California corporation doing business in the County of San Diego, California. It is a medical practice engaged in the treatment of patients with intractable pain, among other conditions and, from time to time, provides service to Medicare insureds. SDCPMC brings this action for its own benefit and also as a realtor on behalf of and for the benefit of the People of the State of California pursuant to section 1871.7(e)(1) of the Insurance Code.

LAW OFFICES OF MATTHEW D. RIFAT, APC
POST OFFICE BOX 19879
SAN DIEGO, CALIFORNIA 92159
(619) 708-3675

24. Plaintiff Pacific Surgical Institute of Pain Management, Inc. is a California corporation doing business in the County of San Diego, California. It is a surgery center providing service to physicians and their patients in the performance of medical procedures including those for the treatment of patients with chronic pain. Pacific Surgical brings this action for its own benefit and for the benefit of the People of the State of California pursuant to section 1871.7(e)(1) of the Insurance Code.

25. Defendant JAYSEN EISENGREIN is an adult resident citizen of the State of California.

26. Defendant SANDRA LOVE is an adult resident citizen of the State of Maryland. Love is President of Integrity Solutions at Qlarant and is Defendant Eisengrein's supervisor.

27. At all times herein mentioned, on information and belief, each of the defendants was the agent, servant, employee or joint venturer of each other remaining defendant and in doing the things herein alleged was acting within the course and scope of their agency, and employment to further each other's own financial interest. Defendants, and each of them, acted with the knowledge, notification, consent and ratification of each of the other defendants. All the acts taken by any employees or agent of any of the defendants were in fact ratified and adopted by the managing personnel of each named defendant.

28. The true names and capacities whether individual, corporate, associate or otherwise, of any of the defendants named herein as DOES 1 through 200 are unknown to Plaintiff who therefore sues said Defendants by such fictitious names and Plaintiff will amend this Complaint to show their true names and capacities together with appropriate charging allegations necessary when the same are ascertained. Plaintiff is informed and believe sthat each of the defendants named herein as DOES was in some way responsible for the loss suffered by Plaintiff. Plaintiff at all times did not know the precise nature of the conduct or participation of said fictitiously-named Defendants and therefore prays that this Complaint be amended if necessary to include such particulars once ascertained.

29. DOES 1 through 100 were or are individuals or entities acting as agents or employees of defendants, acting within the scope of agency or employment and engaging in the conduct

LAW OFFICES OF MATTHEW D. RIFAT, APC
POST OFFICE BOX 19879
SAN DIEGO, CALIFORNIA 92159
(619) 708-3675

LAW OFFICES OF MATTHEW D. RIFAT, APC
POST OFFICE BOX 19879
SAN DIEGO, CALIFORNIA 92159
(619) 708-3675

hereinafter alleged. Each individual acted with full knowledge of the illegality of the activities and conduct undertaken in connection with the aforementioned entities, and conspired in, acquiesced, ratified, or approved of the conduct herein alleged undertaken by the other Defendants.

30. DOES 101 through 150 were or are individuals or entities that had an ownership interest in, operated, were shareholders of, succeeded, merged with, acquired the assets and/or accounts of, or received property of Defendants distributed to them.

31. DOES 151 through 200 were or are individuals or entities who aided, abetted, assisted, otherwise participates in, or were or are involved in the fraudulent conduct hereinafter described; and aided, abetted, or assisted the other Defendants with knowledge of or reckless disregard for the illegality of the activities and conduct.

32. Defendants and each of them, knowingly, willfully, and intentionally conspired with each other defendant and agreed to a course of action to defraud Plaintiff through illegal schemes as well as fraudulent and/or unlawful statements made in opposition to Plaintiff's claims in connection with insurance.

**FIRST CAUSE OF ACTION**

(California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7)

(As to all Defendants and DOES 1-20, 101-125, and 151-175)

33. Plaintiff re-alleges and incorporates paragraphs 1 through 32 above as though fully set forth herein.

34. This is a claim for penalties and assessments under the Insurance Frauds Prevention Act.

35. By virtue of the conduct alleged herein, Defendants and each of them, have repeatedly violated California Penal Code sections 118, 127, 186.2, 549 and 550, by engaging in or aiding, abetting, soliciting, assisting or conspiring with any person to engage in the following prohibited acts or conduct:

A. Knowingly presenting or causing to be presented false or fraudulent written or oral material statements in opposition to a claim for compensation for the purpose of denying compensation;

B. Making or soliciting the making of false statements under oath; and

C. Engaging in criminal profiteering activity.

36. As a result of such conduct on the part of the Defendants, Plaintiff has been damaged in substantial amounts and are entitled to penalties and assessments for each violation of Penal Code section 550 in accordance with section 1871.7 of the Insurance Code in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**

(California Unfair Competition Act)

(California Business & Professions Code §§ 17200, *et seq.*)

(As to all Defendants and DOES 51-100, 126-150, and 176-200)

37. Plaintiff re-alleges and incorporates paragraphs 1 through 36 above as though fully set forth herein.

38. California Business & Professions code sections 17200, *et seq.* were enacted to protect businesses from unfair business practices of competitors. The statute has been expanded to protect consumers from any "unlawful, unfair or fraudulent business act or practice" and any "unfair, deceptive, untrue or misleading advertising."

39. Under section 17203 of the Business & Professions Code, "[a]ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired as a means of such unfair competition."

LAW OFFICES OF MATTHEW D. RIFAT, APC
POST OFFICE BOX 19879
SAN DIEGO, CALIFORNIA 92159
(619) 708-3675

40. Under section 17201 of the Business & Professions Code, the Plaintiffs are "persons" as defined by statute.

41. The conduct of defendants, and each of them, as alleged herein, constitutes "unfair competition" under section 17200 of the Business & Professions Code which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, and fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." Defendants' conduct constitutes unlawful, unfair, and fraudulent business acts in that such conduct violates California law including, but not limited to, sections 118, 127, 186.2, 549 and 550 of the Penal Code and the California Insurance Fraud Prevention Act codified in section 1871.7 of the Insurance Code.

42. As a result of the conduct of Defendants, and each of them, as alleged herein, Plaintiff has suffered the loss of substantial amounts of money and reputational harm. Under section 17204 of the Business & Professions Code, Plaintiff is a "person who has suffered injury in fact and has lost money or property as a result of such unfair competition." Accordingly, Plaintiff asks this Court to issue orders and enter judgment in favor of Plaintiffs and against Defendants are hereinafter set forth.

**PRAYER**

WHEREFORE, PLAINTIFF prays for judgment of this Court against DEFENDANTS as follows:

A. For all penalties and assessments allowable under section 1871.7(b) of the Insurance Code as to each Defendant for each instance in which the Defendant is found to have violated section 550 of the Penal Code for each fraudulent opposition to Plaintiff's claims;

B. A temporary injunction to prevent the transfer, concealment or dissipation of sums gained from Defendants' misconduct;

C. A temporary injunction to protect the public by prohibiting Defendants from engaging in the conduct complained of; and

D. A permanent injunction with the same terms as set forth above in connection with a temporary injunction.

LAW OFFICES OF MATTHEW D. RIFAT, APC
POST OFFICE BOX 19879
SAN DIEGO, CALIFORNIA 92159
(619) 708-3675

E. That the Court impose a constructive trust on Defendants, as constructive trustees for the benefit of Plaintiff with respect to any real or personal property, to prevent the transfer, concealment and/or dissipation of property that was acquired with the proceeds of Defendants' fraudulent activity, including but not limited to sums comprised of salaries and bonuses due or paid to the Defendants and other such economic benefits. On information and belief, Defendants, and each of them, have used monies and proceeds from the wrongful conduct alleged herein to acquire title to real property; on information and belief, Defendants, and each of them, have used monies and proceeds from the wrongful conduct alleged herein to deposit monies into accounts at various banks. Plaintiff is presently unaware of the location of any further monies and proceeds wrongfully taken from Plaintiff and others by Defendants. As further investigation and discovery is conducted on this matter, Plaintiff will amended this Complaint to allege the location and nature of the monies and proceeds wrongfully taken by the Defendants. On information and belief, and due to the nature of the Defendants' conduct alleged herein, Plaintiff has not been able to identify all real property, personal property or accounts acquired by Defendants, and each of them, with monies or proceeds from the wrongful conduct alleged herein; and Plaintiff is entitled to and request sequitable relief in the form of a constructive trust, upon all real property, personal property and accounts which are identified at the time of trial;

F. That the Court impose equitable liens on Defendants to prevent such Defendants from retaining or enjoying the benefits of property acquired as a result of Defendants' wrongful and fraudulent conduct, as herein alleged. It is requested that the Court find an equitable lien in favor of Plaintiff and against Defendants in the amount of the judgment for the Plaintiff in this action. On information and belief, the monies and funds acquired by virtue of the wrongful conduct alleged herein can be traced to the purchase, improvement, betterment, or deposit into real property, personal property, or accounts at banks, savings and loans, mutual fund deposits, corporations, partnerships, or other accounts or business entities.

G. For attorneys' fees;

H. For costs of suit; and

LAW OFFICES OF MATTHEW D. RIFAT, APC
POST OFFICE BOX 19879
SAN DIEGO, CALIFORNIA 92159
(619) 708-3675

I. For such other and further relief as this Court deems just and proper.

LAW OFFICES OF MATTHEW D. RIFAT, APC

Dated: March 29, 2022 BY: [signature]

Matthew D. Rifat
Attorneys for Plaintiffs

LAW OFFICES OF MATTHEW D. RIFAT, APC
POST OFFICE BOX 19879
SAN DIEGO, CALIFORNIA 92159
(619) 708-3675



LAW OFFICES OF MATTHEW D. RIFAT, APC
POST OFFICE BOX 19879
SAN DIEGO, CALIFORNIA 92159
(619) 708-3675

# EXHIBIT "A"



Unified Program Integrity Contractor
Western Jurisdiction (UPIC W)

Delivery Method: Federal Express

February 8, 2022

Matthew D. Rifat, Esq.
Law Offices of Matthew D. Rifat, APC
3703 Camino Del Rio South, Suite 200
San Diego, CA 92108

**Re:** San Diego Comprehensive Pain Management Center
**Provider/Supplier Medicare ID Number(s):**
**Provider/Supplier NPI Number:**
**Reference Number:**

Dear Mr. Rifat:

This letter is in response to the correspondence, dated November 18, 2021, titled "Provider Rebuttal and Demand for Termination of Suspension of Medicare Payments" (referenced herein as "rebuttal"), and the correspondence, dated January 12, 2022, titled "Notice of CMS Default & Non-Compliance with 42 C.F.R. § 405.375(b)(2)," that you submitted to Qlarant Integrity Solutions, LLC ("Qlarant"), the Unified Program Integrity Contractor ("UPIC") for Medicare Program Integrity in the Western jurisdiction, on behalf of your client, David J. Smith, M.D., and his practice, San Diego Comprehensive Pain Management Center, Inc. ("SDCPMC"), regarding the suspension of SDCPMC's Medicare payments, which took effect on September 7, 2021.[1]

Prior notice of the suspension was not provided because giving prior notice would place additional Medicare funds at risk and hinder the ability of the Centers for Medicare & Medicaid Services ("CMS") to recover any determined overpayment. *See* 42 C.F.R. § 405.372(a)(3).

On November 22, 2021, and January 18, 2022, respectively, Qlarant received your rebuttal and January 12, 2022, correspondence, and forwarded them to CMS. As stated in Qlarant's response, dated November 16, 2021, to your previous correspondence regarding this payment suspension, CMS is responsible for determining if a suspension of Medicare payments is warranted under applicable federal regulations and, as appropriate, whether and when a suspension may be terminated. *See* 42 C.F.R. § 405.375.

As stated in the Notice of Suspension ("Notice"), dated October 22, 2021, the suspension of Medicare payments to SDCPMC is based on credible allegations of fraud. *See* 42 C.F.R. § 405.371(a)(2). Specifically, the suspension of SDCPMC's Medicare payments is based on, but not limited to, information that SDCPMC misrepresented services billed to the Medicare

[1] An interim response to the correspondence submitted November 18, 2021 was provided on December 3, 2021, in accordance with Chapter 8 of the Medicare Program Integrity Manual (CMS Pub. 100-08 or "MPIM"), Section 8.3.2.2.5.

28464 Marlboro Avenue • Easton, Maryland 21601-2732
866.269.3494 • www.qlarant.com



program. More particularly, CMS has credible allegations that SDCPMC submitted claims to Medicare for services that were medically unnecessary.

With the rebuttal, you provide various exhibits and assert, on behalf of SDCPMC, the following statements for consideration (many of which were already addressed in Qlarant's response, dated November 16, 2021, to your previous correspondence), which CMS addresses individually:

1. ***"...there is no indicia of fraud."***

   ***"The Provider is not engaged in any misconduct or fraud."***

   ***"...there is no evidence of any conceivable fraud or abuse on the part of the Provider in connection with their treatment of patients with intrathecal pain pumps or otherwise."***

   ***"For the claim of 'fraud' to fit the suspension, you must have evidence that the Provider knowingly and willfully executed or attempted to execute a scheme or artifice to defraud a health care benefit program.... [in violation of 18 U.S.C. § 1347(a)]."***

Federal law explicitly authorizes the suspension of Medicare payments to providers and suppliers in cases of suspected fraud. *See* 42 U.S.C. § 1395y(o) and 42 C.F.R. § 405.371(a)(2). CMS does not agree that SDCPMC has complied with Medicare rules. CMS refers you to the discussion in the Notice, dated October 22, 2021, as well as Qlarant's response, dated November 16, 2021, to your previous correspondence regarding this payment suspension.

And in particular, the criminal statute 18 U.S.C. § 1347(a) is not applicable to this payment suspension matter. As previously discussed in the Notice dated October 22, 2021, this payment suspension is based on credible allegations of fraud. CMS regulations control here and define credible allegations of fraud as an allegation from any source including, but not limited to, fraud hotline complaints, claims data mining, patterns identified through audits, civil false claims cases, and law enforcement investigations. *See* 42 C.F.R. § 405.370(a). Allegations are considered to be credible when they have indicia of reliability. *See* 42 C.F.R. § 405.370. Such credible allegations are described in the Notice dated October 22, 2021.

CMS has credible allegations that SDCPMC has misrepresented services billed to the Medicare program through submission of claims for medically unnecessary services; therefore, CMS must exercise its authority to protect the Medicare program funds and conduct further investigation of SDCPMC's billing.

2. ***"...suspension threatens closure of the Provider's pain management practice and threatens the health, safety and lives of a large number of Medicare patients in addition to non-Medicare patients."***

   ***"The Provider's suspension... poses a real and immediate danger to the life, health and safety of Medicare beneficiaries. Specifically, those Medicare beneficiaries who***

***are being treated through the use of intrathecal pain pumps are at risk for death or other serious consequences as a result of opioid withdrawal, reversion to oral opioids that are subject to diversion or abuse, and interruption of their longstanding medical treatment."***

***"If the suspension... is not immediately resolved and lifted, the Provider and its patients will suffer immediate and irreparable injury, loss and damage, as follows:***

*a.* ***The Provider will be forced to close its operations because of insolvency or bankruptcy;***
*b.* ***The Provider will be unable to provide life-saving medical care to its patients;***
*c.* ***The Provider... will be unable to care for its 84 pump patients and those patients, in turn, will have nowhere to go to receive treatment because of the decimation of pain management physicians by regulatory and law enforcement action in Southern California... and***
*d.* ***The Provider's ability to provide continuity of care to vulnerable pain patients who suffer chronic pain is jeopardized."***

***"California and law enforcement have apparently obliterated the pain management community. This means that the Provider's patients, who depend on their care, are effectively being shut out of the life-saving treatment given to them and face the very real potential of dying as a result."***

CMS is very sensitive to the needs of Medicare beneficiaries and does not agree that suspension of SDCPMC's Medicare payments will jeopardize the ability of SDCPMC's patients to access pain treatment services and potentially endanger their health. CMS has reviewed beneficiary access to pain management services in the San Diego area and has determined there are over 100 doctors and clinicians offering pain management services to Medicare beneficiaries in the area served by SDCPMC; therefore, beneficiaries currently served by SDCPMC will be able to access such services. Thus, CMS has determined that suspension of SDCPMC's Medicare payments is warranted during the ongoing investigation.

*3.* ***"...an analysis of the medical records for the claims which Qlarant's October 22, 2021 correspondence asserts 'provide evidence of [its] findings and serve as a basis for the determination to suspend [the provider's] Medicare payments....' ...evidence that suspension is entirely inappropriate."***

***"The Provider has complied with each of the requirements outlined in [Noridian Local Coverage Article Implantable Infusion Pumps for Chronic Pain (A55239)] since its adoption."***

Qlarant has reviewed the documentation SDCPMC submitted for each of the nine example claims listed in the Notice, as well as the medical record analysis within your correspondence, and has determined that the documentation provided is insufficient to establish that the services provided were reasonable and medically necessary as required by 42 U.S.C. § 1395y, and does not support compliance with Medicare coverage guidelines, including Noridian

Healthcare Solutions Local Coverage Article: Billing and Coding: Implantable Infusion Pumps for Chronic Pain (A55239). These determinations are based on findings that:

- The documentation did not include a progress or procedure note for the date of services at issue (as to claims 1, 3, 5, 7, and 9).
- The billing noted the Service Facility Location Information was for another facility (as to claims 1, 3, 5, 7, and 9).
- The documentation did not support that oral or subcutaneous medication treatments were ineffective or complicated by unacceptable side effects (as to claims 2, 4, 6, and 8).
- The documentation did not support the failure of other treatment modalities (as to claims 2, 4, 6, and 8).
- The documentation did not include an evaluation by a specialist familiar with the underlying disease to validate failure of other treatment modalities and that no other reasonable options were available (as to claims 2, 4, 6, and 8).
- The documentation noted the pump was analyzed and filled by a registered nurse but was signed by the physician as the rendering provider (as to claim 2).
- There was no informed consent signed by the beneficiary for the services billed (as to claims 2, 4, 6, and 8).

Payment suspension enables CMS to protect program funds while the government completes its investigation. The ongoing investigation, which has included medical review, as well as other investigative activities, has revealed credible allegations that SDCPMC misrepresented services billed to the Medicare program. Again, credible allegations of fraud are defined to include an allegation from any source including, but not limited to, fraud hotline complaints, claims data mining, patterns identified through audits, civil false claims cases, and law enforcement investigations. Allegations are considered to be credible when they have indicia of reliability. *See* 42 C.F.R. § 405.370. Qlarant's medical review findings fall within the definition of "[c]redible allegation of fraud" at 42 C.F.R. § 405.370(a).

4. ***"The reimbursement methodology used and the documentation and treatment disclosed by the Provider show complete compliance with Medicare rules and, indeed, Medicare and Qlarant have endorsed a finding of compliance in their disposition of nearly all of the audits and prepayment reviews of the Provider in its favor."***

   ***"Since 2009,* for the past twelve years, *the Provider has worked with Medicare and its Medicare Administrative Contractors, Palmetto and Noridian (as Palmetto's successor), to resolve intermittent interruptions in the Provider's reimbursement for pump medications. Based on the suspension, those interruptions now appear to have been part of a pattern of misbehavior by the MACs or Medicare contractors to void reimbursement for intrathecal pain pumps."***

   ***"In 2010, the Provider and Palmetto agreed upon a reimbursement method for medications used to fill the pain pumps. That method was ratified by Noridian, which adopted an express reimbursement formula in 2013."***

*"The correspondence [dated January 7, 2020, from SDCPMC's attorney to Palmetto and included with the rebuttal as Attachment 6] focused squarely on the issues that appear to have reappeared here...."*

*"In... correspondence... [from Palmetto to the Provider] ..., including the adoption of a reimbursement policy, CMS established definitively the means by which pump medications would be reimbursed. The Provider has followed that reimbursement methodology and has not engaged in any misconduct relative to treatment of patients with intrathecal pain pumps and medication and billing for the services or, for that matter, with any other patients or treatment."*

*"... the Provider has been repeatedly audited and even subjected to pre-payment review in which Medicare withheld payment until it reviewed and evaluated evidence related to the providers' billing (which it did through Qlarant). ... None of those [audits and reviews] has resulted in any claim of fraud or other misconduct. ...in September, 2018, the Provider produced thousands of pages of medical records relating to pump billing and treatment of their patients in response to an administrative subpoena by the United States Department of Justice Drug Enforcement Administration."*

*"The Provider was repeatedly audited or reviewed in connection with its pump services. ... None of those activities resulted in a determination of incorrect billing or coding, lack of medical necessity or other justification for denial of reimbursement for the Provider."*

*"The February 2017 [Noridian Redetermination] decision... concluded that, as to Dr. Thompson* **but not the Provider or any other physician providing he** *[sic]* **same services,** *there was no medical necessity for pump fills despite having been approved and reimbursed for years in pumps whose implantation had been approved and reimbursed by the MAC. ... The appeal of that decision for hearing before an Administrative Law Judge has been pending for nearly four years."*

*"... The appeal of one denied prepayment review claim [that was ultimately determined in the Provider's favor] illustrates the lack of any foundation for claims of fraud or abuse meriting suspension."*

*"[A Qlarant] pre-payment review... was ultimately lifted without any claim of fraud." "In October of 2020, Qlarant issued a number of claims denials... claiming a 100% error rate. ... However, those findings were challenged and the claims ultimately paid."*

The above assertions do not preclude further claim review by CMS and its contractors. Further, prior findings and appeal results do not invalidate Qlarant's review findings relevant to the claims that are currently at issue. Again, the relevant Qlarant review findings are discussed in the Notice, dated October 22, 2021, and Qlarant's response, dated November 16, 2021, to your previous correspondence regarding this payment suspension, as well as this response to the rebuttal.

Finally, in your correspondence, dated January 12, 2022, you assert that, because written notice of the determination whether the facts justify the termination of the suspension was not provided within 15 days of Qlarant's receipt of the SDCPMC November 18, 2021, rebuttal, "CMS and Qlarant are estopped... from asserting that their suspension of the provider's payments were [*sic*] justified."

As an initial matter, CMS notes that you also previously submitted, on behalf of SDCPMC, correspondence dated September 16, 2021, identified as a "Rebuttal Letter"; that CMS provided an interim response to on September 29, 2021; and that CMS provided a final response on November 16, 2021, to that September 16, 2021 "Rebuttal Letter." Notably, CMS regulations do not authorize more than one rebuttal statement. However, CMS reviews and considers all information submitted.

In any event, 42 C.F.R. § 405.375 states, in relevant part:

> (a) Submission and disposition of evidence. If the provider or supplier submits a statement, ..., under § 405.372(b)(2), why a suspension should be terminated, CMS, the intermediary, or carrier must within 15 days, from the date the statement is received, consider the statement (including any pertinent evidence submitted), together with any other material bearing upon the case, and determine whether the facts justify the suspension, offset, or recoupment or, if already initiated, justify the termination of the suspension, offset, or recoupment. Suspension, offset, or recoupment is not delayed beyond the date stated in the notice in order to review the statement.
>
> (b) Notification of determination. The Medicare contractor must send written notice of the determination made under paragraph (a) of this section to the provider or supplier. ....

Notably, although 42 C.F.R. § 405.375(a) requires, within 15 days, the consideration of a rebuttal and a determination of whether the facts justify the suspension or the suspension's termination, 42 C.F.R. § 405.375(b) *does not* specify that *written notice* of such determination regarding the suspension or the suspension's termination must also be issued within 15 days, nor does 42 C.F.R. § 405.375(a). The CMS regulations do not support the position you took in your January 12, 2022, correspondence. Consequently, CMS does not agree that it is "estopped" from continuing the suspension of SDCPMC's Medicare payments during the ongoing investigation into credible allegations of fraud.

In conclusion, after a careful review of SDCPMC's rebuttal, dated November 18, 2021, and consideration of the materials submitted with it, as well as your correspondence, dated January 12, 2022, CMS has determined that the assertions therein do not justify termination of the determination to suspend Medicare payments to SDCPMC due to credible allegations of fraud. *See* 42 C.F.R. § 405.375. While this determination is not appealable, CMS will consider any additional information and/or evidence you may submit on behalf of SDCPMC.

If you have any questions, please direct your written inquiry to
adminactions_upicw@qlarant.com.

Sincerely,

Jaysen Eisengrein, MBA, PgC, BS
Senior Vice President, Program Director - UPICW
Qlarant Integrity Solutions, LLC

LAW OFFICES OF MATTHEW D. RIFAT, APC
POST OFFICE BOX 19879
SAN DIEGO, CALIFORNIA 92159
(619) 708-3675

# EXHIBIT "B"

# LAW OFFICES OF MATTHEW D. RIFAT, APC

POST OFFICE BOX 19879
San Diego, California 92159

**Matthew D. Rifat**

**Also admitted in
Arizona & Mississippi**

**Telephone: (619) 708-3675**

**Correspondent's E-Mail:
matthew.rifat@lomdr.com**

February 25, 2022

*Via Overnight Delivery*

Qlarant Integrity Solutions, LLC
Attn: Jaysen Eisengrein
UPICW Rebuttal and Suspension Department
28464 Marlboro Avenue
Easton, Maryland 21601-2732

RE: *San Diego Comprehensive Pain Management Center, Inc.*
Provider/Supplier Medicare ID Number: [redacted]
Provider/Supplier NPI: [redacted]
PSP Number: [redacted]
**RESPONSE TO FEBRUARY 8, 2022 QLARANT CORRSPONDENCE & REPEATED DEMAND FOR TERMINATION OF SUSPENSION OF MEDICARE PAYMENTS**

Dear Mr. Eisengrein:

Thank you for your correspondence of February 8, 2022 (Attachment 1) concerning the suspension of the referenced provider by Medicare. We have additionally received your correspondence of February 22, 2022, purporting to extent the period of the provider's suspension for 180 days effective March 5, 2022.

Your February 22, 2022 correspondence is deeply troubling.

Under California law, the fraudulent denial of an insurance claim or assisting in or conspiring to do so is a crime. Cal. Penal Code § 550(b)(1),(2),(3). Such misconduct is actionable civilly against the individuals and organizations involved. Cal. Ins. Code §§ 1871, *et seq.* The positions expressed in your correspondence are demonstrably false and a pretext for continued suspension of the provider. They are part of a fraudulent denial of valid claims. This is underscored by your firm's possession of documentation evidencing that its contentions are false and unsupported.

Qlarant Integrity Solutions, LLC
Attn: Jaysen Eisengrein
UPICW Rebuttal and Suspension Department
February 25, 2021

Your firm may expect that the administrative process to challenge the provider's suspension is so drawn out and time consuming that it is futile. Perhaps your firm has concluded that the positions taken in your correspondence will not be subject to independent scrutiny. Put more directly, your firm appears to have concluded that it does not want to pay the provider's claims and has no interest in whether it has a valid position for doing so. The principal motivation for your firm's action is the desire to avoid paying for claims related to intrathecal pump treatment ("IT") of patients with chronic pain. The provider's IT treatment has been consistently reimbursed for over a decade under a methodology which resulted, in part, from direct negotiations between the then-MAC's Medical Director and the provider. For over a decade, the provider's IT claims have been subjected to almost annual audit by the CMS, the MAC or your firm and the provider has even been subject to prepayment review. In no instance has the provider been told that its services were medically unnecessary or that there was suspicion of fraud.

Your firm appears to desire to simply say whatever needs to be said to maintain the provider's suspension, however absurd. Of note, the suspension affects *all* of the provider's services—whether related to IT or not—including office visits, evaluations, and all surgical procedures. It is impossible to believe that your firm honestly believes that *all* of the provider's services are fraudulent.

I urge your firm to reconsider its position immediately. In view of the delay to provide a response to the provider's original challenges of the suspension, it has already initiated review by an Administrative Law Judge. You can expect that in the coming days, it will pursue appropriate additional legal action as well. In other words, this is your firm's last opportunity for an informal, amicable resolution of this matter.

Your firm takes the position that "CMS has credible allegations that SDCPMC has misrepresented services billed to the Medicare program through submission of claims for medically unnecessary services . . . ." Eisengrein Feb. 8, 2022 Corresp. at 2. Your correspondence is replete with false statements. Each is discussed in turn below.

***CMS "does not agree that suspension of SDCPMC's Medicare payments will jeopardize the ability of SDCPMC's patients to access pain treatment services and potentially endanger their health. CMS has reviewed beneficiary access to pain management services in the San Diego area and has determined there are over 100 doctors and clinicians offering pain management services . . . ."***

This statement is disingenuous and deceitful.

There are a small handful of *doctors* who provide care to patients with IT pumps. The provider, as you know, has the largest IT pump population of any doctor in the San Diego area and is expert in provision of this care (which comprises less than three percent of its overall practice). Especially given the animosity expressed towards pain management specialists that has driven them out of practice, your claim that there are over 100 doctors who could

presumably take over the provider's patients, including IT patients, is false. I challenge you to name the more than 100 doctors available to provide IT pain management care in the San Diego area.

I note your choice of language. You reference "doctors and *clinicians*". If you mean to include mid-level, non-physician providers, their inclusion dishonestly inflates the number of providers available to care for pain patients, including care with IT treatment.

Finally, as you know, the present administration has taken the position that efforts should be made to avoid disparate impacts of governmental decisions on people who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality. *See Executive Order On Advancing Racial Equity and Support for Underserved Communities Through the Federal Government* (Jan. 20, 2022). Your firm's action effectively denies access to care to pain patients within those groups because of their dependence on CMS to pay for their care and, in particular, denies them access to a treatment modality, IT treatment, that is otherwise available to those who can afford to pay for it themselves or through private insurance.

> ***The documentation [provided by the provider in support of its claims] did not include a progress or procedure note for the date of service at issue (as to claims 1, 3, 5, 7, and 9).***

**Claim 1**
Claim Control No. 551120079685920
Patient: G , R
Date of Service: March 18, 2020
Qlarant Claim: Services Were Medically Unnecessary

This claim was billed incorrectly. The actual date of service for which documentation has been provided to you was February 13, 2020. However, the claim was generated on March 18, 2020, and the billing system defaults to that date unless changed by the biller. In this instance, the biller inadvertently did not change that date to the date of service, resulting in a duplicate bill. The erroneous reimbursement is being refunded by the provider.

A progress note was provided provided to your firm evidencing the services provided on February 13, 2020 in the provider's clinic and is included with this correspondence (Attachment 2). An operative report for the surgery performed on February 13, 2020, relating to the Claim Control referenced above (the professional component of a surgery) is also included with this correspondence (Attachment 3).

Qlarant Integrity Solutions, LLC
Attn: Jaysen Eisengrein
UPICW Rebuttal and Suspension Department
February 25, 2021

**Claim 3**
Claim Control No. 551120290669550
Patient: B[redacted], N[redacted]
Date of Service: September 19, 2020
Qlarant Claim: Services Were Medically Unnecessary

Both a progress and a procedure note have been provided (Attachment 4 (Clinical Care) and Attachment 5 (ASC Care)).

**Claim 5**
Claim Control No. 551120339589130
Patient: S[redacted], C[redacted]
Date of Service: October 3, 2020
Qlarant Claim: Services Were Medically Unnecessary

Both a progress and a procedure note have been provided (Attachment 6 (Clinical Care) and Attachment 7 (ASC Care)).

**Claim 7**
Claim Control No. 551120303544050
Patient: B[redacted], B[redacted]
Date of Service: October 3, 2020
Qlarant Claim: Services Were Medically Unnecessary

Both a progress and a procedure note have been provided (Attachment 8 (Clinical Care) and Attachment 9 (ASC Care)).

**Claim 9**
Claim Control No. 551420307036850
Patient: B[redacted], A[redacted]
Date of Service: October 3, 2020
Qlarant Claim: Services Were Medically Unnecessary

Both a progress and a procedure note have been provided (Attachment 10 (Clinical Care), 11 (ASC Care)).

***The billing noted the Service Facility Location Information was for another facility (as to claims 1, 3, 5, 7, and 9).***

**Claim 1**
Claim Control No. 551120079685920
Patient: G[redacted], R[redacted]
Date of Service: March 18, 2020
Qlarant Claim: Services Were Medically Unnecessary

As mentioned above, this claim appears to have been inadvertently billed twice and corrective measures are being taken. As for the February 13, 2020, correct date of service, you were provided with access to the claim forms related to the two components of this date of service and, indeed, it can be expected that you have access to those from either CMS or the MAC. (Attachment 12 (ASC Care); Attachment 13 (Clinical Care)). You were also provided with the medical records for the date of service. One claim form was for medication used to fill the pump which is done in the provider's pump room in the clinic. The other claim form is for the professional fees incurred in the implantation of the pump at Pacific Surgical Institute of Pain Management, Inc., a Medicare approved surgery center. For clarity, the patient's pump was implanted in the surgery center and, then, post-operatively, the patient's pump was filled in clinic. This has been the practice of this provider for approximately two decades. The billing accurately reflects the service facility location consistent with where care was actually rendered.

**Claim 3**
Claim Control No. 551120290669550
Patient: B[redacted], N[redacted]
Date of Service: September 19, 2020
Qlarant Claim: Services Were Medically Unnecessary

You were provided with access to the claim forms related to the two components of this date of service and, indeed, it can be expected that you have access to those from either CMS or the MAC. (Attachment 14 (ASC Care)). You were also provided with the medical records for the date of service. One claim form was for medication used to fill the pump which is done in the provider's pump room in the clinic. The other claim form is for the professional fees incurred in the implantation of the pump at Pacific Surgical Institute of Pain Management, Inc., a Medicare approved surgery center. For clarity, the patient's pump was implanted in the surgery center and, then, post-operatively, the patient's pump was filled in clinic. This has been the practice of this provider for approximately two decades. The billing accurately reflects the service facility location consistent with where care was actually rendered.

**Claim 5**
Claim Control No. 551120339589130
Patient: S[redacted], C[redacted]
Date of Service: October 3, 2020
Qlarant Claim: Services Were Medically Unnecessary

You were provided with access to the claim forms related to the two components of this date service (Attachment 15 (Clinical Care); Attachment 16 (ASC Care)). You were also provided with the medical records for the date of service (Attachment 17 (ASC Care); Attachment 18 (Clinical Care)). One claim form was for medication used to fill the pump which is done in the provider's pump room in the clinic. The other claim form is for the professional fees incurred in the implantation of the pump at Pacific Surgical Institute of Pain Management, Inc., a Medicare approved surgery center. For clarity, the patient's pump was implanted in the surgery center and, then, post-operatively, the patient's pump was filled in clinic. This has been the practice of this provider for approximately two decades. The billing accurately reflects the service facility location consistent with where care was actually rendered.

**Claim 7**
Claim Control No. 551120303544050
Patient: B[redacted], B[redacted]
Date of Service: October 3, 2020
Qlarant Claim: Services Were Medically Unnecessary

You were provided with access to the claim forms related to the two components of this date service. You were also provided with the medical records for the date of service. In addition to Medicare coverage, this patient had secondary insurance. Therefore, separate claims properly issued to each carrier.

One claim form was for medication used to fill the pump which is done in the provider's pump room in the clinic (Attachments 19 (Primary), 20 (Secondary)). The other claim form is for the professional fees incurred in the implantation of the pump at Pacific Surgical Institute of Pain Management, Inc., a Medicare approved surgery center (Attachments 21 (Primary), 22 (Secondary)). For clarity, the patient's pump was implanted in the surgery center and, then, post-operatively, the patient's pump was filled in clinic. This has been the practice of this provider for approximately two decades. The billing accurately reflects the service facility location consistent with where care was actually rendered.

**Claim 9**
Claim Control No. 551420307036850
Patient: B█████, A█████
Date of Service: October 3, 2020
Qlarant Claim: Services Were Medically Unnecessary

You were provided with access to the claim forms related to the two components of this date of service and, indeed, it can be expected that you have access to those from either CMS or the MAC. (Attachment 23 (ASC Care); Attachment 24 (Clinical Care)). You were also provided with the medical records for the date of service. One claim form was for medication used to fill the pump which is done in the provider's pump room in the clinic. The other claim form is for the professional fees incurred in the implantation of the pump at Pacific Surgical Institute of Pain Management, Inc., a Medicare approved surgery center. For clarity, the patient's pump was implanted in the surgery center and, then, post-operatively, the patient's pump was filled in clinic. This has been the practice of this provider for approximately two decades. The billing accurately reflects the service facility location consistent with where care was actually rendered.

***The documentation did not support that oral or subcutaneous medication treatments were ineffective or complicated by unacceptable side effects (as to claims 2, 4, 6, and 8).***

**Claim 2**
Claim Control Nos. 551120280748160
Patient: B█████, N█████
Date of Service: September 19, 2020
Qlarant Claim: Services Were Medically Unnecessary

This patient was implanted with an intrathecal pump after more than a decade of failure of oral or subcutaneous treatments. The medical records provided to your firm evidence that. As explained in our correspondence of November 18, 2021 *and I repeat with emphasis*:

> Nancy Baglioni-Melling has been a patient of the Provider for more than a decade. She had a history of failed back fusion surgery with implanted hardware, foot surgery, and knee surgery. **Her history of treatment included oral opioids (she was diagnosed as being opioid dependent), injections and epidurals.** Her pain was consistently reported at high levels, although she plainly had days of lesser pain. **On one occasion in 2016, she was tearful and in pain because pharmacies would no longer fill her prescriptions.** This was during a time when pharmacies were blacklisting certain medications and preventing their refill.
>
> In January of 2018, having continued with her pain management regime, the patient reported that she was planning of having additional surgery to her right shoulder. She also reported that her husband's Alzheimer's disease was

worsening and that this was causing her added stress on top of the stress from her pain.

In January of 2019, the patient reported a period where she felt her treatment was aiding her, although she continued to need to use a walker and her pain was never abated. **She was attempting to self-wean her pain medication. However, the patient's improvement was not long-lived and her pain increased and her condition declined as a result in 2020, with her describing her pain as a "roller coaster . . . always up and then down . . . ." on June 12, 2020.**

On May 6, 2020 (explanted May 13, 2020), the patient had an intrathecal pain pump trial which was successful in providing constant pain relief and allowing her to perform her activities of daily living more independently. After some delay, the patient's permanent pump was implanted on September 19, 2020, and it was filled with Fentanyl and Marcaine and set at a rate of 1.401 mg/day.

The records plainly supporting the above summary and serving as examples of the need for IT because of ineffectiveness of oral medications are attached (Attachment 25 (on March 1, 2016, the patient reported only getting 4-5 hours pain relief with her pain medication); Attachment 26 (on February 14, 2017, the patient reported pain of 7/10 despite being a patient of the provider for 16 years); Attachment 27 (on January 4, 2018: the patient "has tried and failed . . . anti-inflammatory med[ications] and Percocet in the past."); Attachment 28 (on March 5, 2018, a repeated risk factor relative to continued oral medication was detected by urinalysis which showed evidence of alcohol use); Attachment 29 (on March 20, 2019, the patient reports "current medication regimen allows her to function and perform ADLs independently but is still experiencing high pain levels as she admits the MS Contin does not last very long.); Attachment 30 (on January 6, 2020: same and pain is at 6/10 with medication); Attachment 31 (on February 4, 2020, the patient reported being unable to get more than 5/10 pain relief with medication and repeated injections); Attachment 32 (on February 13, 2020, the patient "admits to increased pain to her upper back and bilateral shoulders coming from her neck. Patient admits that the MBB [medial branch block] performed last month was ineffective."); Attachment 33 (on April 13, 2020, the patient reported that "her pain as 7/10 on a pain scale of 0-10); Attachment 34 (On June 12, 2020, the patient "admits that while being in oral [medication] regimen 'it feels like a roller coaster with my pain always up and then down . . . ."). The difficulty the patient had with filling her pain medication because pharmacies refused to fill pain medications as prescribed is also documented (Attachment 35 (On January 28, 2016, the patient reported having difficulty obtaining MS Contin from multiple pharmacies)).

Qlarant Integrity Solutions, LLC
Attn: Jaysen Eisengrein
UPICW Rebuttal and Suspension Department
February 25, 2021

**Claim 4**
Claim Control No. 55182307036860
Patient: S[redacted], C[redacted]
Date of Service: October 3, 2020
Qlarant Claim: Services Were Medically Unnecessary

This patient was implanted with an intrathecal pump after more than a decade of failure of oral or subcutaneous treatments. The medical records provided to your firm evidence that. As explained in our correspondence of November 18, 2021 *and I repeat with emphasis*:

> The patient's medical record consistently reported the medical necessity and appropriateness of intrathecal therapy, stating repeatedly:
>
> > This patient[']s pump refill and regular pump maintenance is medically indicated, necessary and appropriate by David J. Smith, M.D., Board Certified in Pain Medicine, in order to control this patient[']s chronic intractable non-malignant/malignant pain, improve daily function and to prevent exacerbation of this patient[']s choring intractable non-malignant/malignant pain. **The medical necessity and appropriateness of intrathecal drug therapy was established prior to implantation of the spinal infusion pump** by David J. Smith, M.D. who is Board Certified in Pain medicine, and has been reestablished with each office visit. **This patient had failed an adequate trial of all other therapy such as interventional pain procedures and surgical intervention and oral medications. Further surgical intervention was not indicated or was refused. At the time of this patient[']s intrathecal pump trial and eventual implantation of the permanent device there were no other reasonable options for pain control for this patient given the patient[']s life expectanc[y] of greater than 3 months.**

The earliest available chart note available for this patient is dated January 18, 2013 and the patient has been receiving IT treatment for more than a decade. If your firm believes it needs records from more than ten years ago to establish medical necessity, please let me know. The standard of care within the medical community is to maintain medical records for a period of ten years—informed, in part, by *Cochise Consultancy, Inc. v. United States* ex rel. *Hunt* 139 S. Ct. 1507 (2019) (an action brought by a private party or whistleblower on behalf of the government is subject to a ten year statute of limitations). *See* Cooperative of Am. Physicians, *How Long Do I have to Keep My Patient's Medical Records?* (https://www.capphysicians.com/how-long-must-medical-records-be-kept (accessed Feb. 18, 2022)); 42 C.F.R. § 422.506(d); 42 C.F.R. § 438.3(u).

Qlarant Integrity Solutions, LLC
Attn: Jaysen Eisengrein
UPICW Rebuttal and Suspension Department
February 25, 2021

**Claim 6**
Claim Control No. 5511202905591030
Patient: B█████, B█████
Date of Service: October 3, 2020
Qlarant Claim: Services Were Medically Unnecessary

The position taken by your firm is inconsistent with the medical record. One factor in a determination of the effectiveness of her oral pain medication is the *amount* of that medication needed to keep her pain under control.

This patient was taking Oxycontin 20mg 1PO BID, Roxicodone 30mg 1 PO Q3HRS NTE 8/day and was receiving Demerol injections (Attachment 36, DOS Jan. 2, 2013). She nevertheless continued to report pain between 5/10 and 9/10 (Attachment 37, DOS Jan 30, 2013; Attachment 38, DOS Mar. 28, 2013; Attachment 39, DOS Oct. 25, 2013). She had sleep disturbances of three times a night because of her pain (Attachment 40, DOS Ap. 29, 2013).

The patient's history placed her at moderate risk of abuse of her pain medication. Additionally, the inconsistency of the pain relief received from significant doses of oral pain medications called for the exploration of an alternative modality. *Over seven years into her treatment with the provider when oral pain medication was consistently tried with inconsistent success*, the patient received a pump trial and reported that "during the trial she received immense pain relief and was able to perform ADLs more independently. Patient [reported] she was able to stand/walk for longer distances at a time. Patient reports as well she even took less oral medications while the pump trial as in. She stated 'it made a great improvement in my quality of life'." (Attachment 41, DOS Mar. 11, 2020). This patient tried and failed a course of oral pain medication prior to implantation of her pump. She tried and failed surgical interventions with the provider and failed physical therapy—all prior to her IT implantation.

**Claim 8**
Claim Control No. 551120294247110
Patient: B█████, A█████
Date of Service: October 3, 2020
Qlarant Claim: Services Were Medically Unnecessary

This patient has been under the provider's care for more than a decade, undergoing all manner of treatments short of IT including epidural injections and multiple intraarticular injections which did not remedy her condition. The patient consistently reported fluctuating pain of over 5/10, made worse with activity. She reported failed injection treatment. (Attachment 42, DOS Jan. 14, 2013). The provider attempted injections on a number of occasions. (*See, e.g.*, Attachment 43, DOS Mar. 20, 2013; Attachment 44, DOS July 13, 2015).

Eventually, the patient's condition worsened. On January 21, 2016, she reported "her left hip and left shoulder are both very painful. Patient reports her pain level today is a 7/10 and she can barely walk. She states that she would like a stronger medication that she can take in the evening." (Attachment 45, DOS Jan. 21, 2016). Her medications included Tylenol-Codeine #3

300mg-30mg tablet TID/PRN, hydrocodone 5/325 TID and tramadol 50mg BID/PRN. (Attachment 46, DOS June 16, 2016).

The patient reported pain of 10/10 in the summer of 2016. She reported being unable to tolerate the Tylenol#3 and that the tramadol was ineffective. She also complained of having blacked out, although it is unclear whether that was related to a UTI or dehydration. (Attachment 47, DOS Aug. 23, 2016). Despite continued injections and oral medications, the patient continued to complaint of a high level of pain and by the close of 2016, was reporting pain of 8/10. (Attachment 48, DOS Dec. 13, 2016).

Over ten years after she began care with the provider and having exhausted all other treatment options, the patient was finally considered for a pump trial in January of 2020. The patient had sought help over the years from specialists in pain management, her family physician, physical therapists, orthopedic surgeons, and others. The patient had attempted bed rest, exercises, heat and ice, injection therapy, massage and physical therapy. The patient was found to be a good candidate for a pump trial because of multiple inconsistencies in her urinalysis, the continued use of a cane for stability, and a significant decrease in the patient's ability to ambulate without intensified pain levels. (Attachment 49, DOS Jan. 15, 2020). With the pump trial, the patient reported 100% relief of her pain and noted improvement in her daily life and expressing a desire for a permanent implant. (Attachment 50, DOS Feb. 20, 2020).

***The documentation did not support the failure of other treatment modalities (as to claims 2, 4, 6, and 8).***

**Claim 2**
Claim Control No. 551120280748160
Patient: B[redacted], N[redacted]
Date of Service: September 19, 2020
Qlarant Claim: Services Were Medically Unnecessary

This claim by your firm is duplicative. Please see the response provided hereinabove. In addition, please examine the medical record more carefully relative to the attempts made to use other modalities such as physical therapy, referrals to other specialists, and electrical stimulation.

**Claim 4**
Claim Control No. 55182307036860
Patient: S[redacted], C[redacted]
Date of Service: October 3, 2020
Qlarant Claim: Services Were Medically Unnecessary

This claim by your firm is duplicative. Please see the response provided hereinabove. In addition, please examine the medical record more carefully relative to the attempts made to use other modalities such as physical therapy, referrals to other specialists, and electrical stimulation. This patient was in an electric wheelchair and not ambulatory until after the pump was implanted

and titrated to therapeutic levels, ultimately becoming ambulatory with an assistive device and independent at home.

**Claim 6**
Claim Control No. 5511202905591030
Patient: B█████, B█████
Date of Service: October 3, 2020
Qlarant Claim: Services Were Medically Unnecessary

This claim by your firm is duplicative. Please see the response provided hereinabove. In addition, please examine the medical record more carefully relative to the attempts made to use other modalities such as physical therapy, referrals to other specialists, and electrical stimulation.

**Claim 8**
Claim Control No. 551120294247110
Patient: B█████, A█████
Date of Service: October 3, 2020
Qlarant Claim: Services Were Medically Unnecessary

This claim by your firm is duplicative. Please see the response provided hereinabove. In addition, please examine the medical record more carefully relative to the attempts made to use other modalities such as physical therapy, referrals to other specialists, and electrical stimulation.

***The documentation did not include an evaluation by a specialist familiar with the underlying disease to validate failure of other treatment modalities and that no other reasonable options were available (as to claims 2, 4, 6, and 8).***

It appears that you have pulled this "basis" for your firm's position from the Local Coverage Article ("LCA") which provides: "In addition, an evaluation by an orthopedic surgeon, neurologist, neurologist, neurosurgeon, oncologist or other specialist familiar with the underlying disease is required to validate that other treatments have failed to alleviate the pain no other reasonable options are available at the time of the evaluation." (Attachment 51, Article - Billing and Coding: Implantable Infusion Pumps for Chronic Pain (A55239)). This LCA contrasts with a Local Coverage Determination ("LCD") for another Medicare Administrative Contractor's LCD for other jurisdictions which provides: "In addition, [for *opioid drugs* to be considered medically reasonable and necessary,] an evaluation by an orthopedic surgeon, neurologist, neurosurgeon, oncologist, pain management physician or other specialist familiar with the underlying disease is required to validate that other treatments have failed to alleviate the pain, unless such a provider is currently managing the patient and documents that such a situation exists in the record." (Attachment 52, LCD – Implantable Infusion Pump (L35112)). This latter LCD permits the pain management provider to make an assessment of the failure of other modalities.

Your firm claim that the provider is engaged in Medicare fraud in apparent reliance on the provision of an LCA. While it is obvious from the medical records that, in fact, the provider

complied with the LCA requirements, it is important to point out that LCAs are not binding on Medicare Administrative Law Judges or the Medicare Appeals Council. 42 C.F.R. § 405.1062(a). The evaluation of whether conduct by a provider is fraudulent is not measured by an LCD or LCA. The question is solely whether, within the applicable standard of care, the services are "reasonable and necessary for the . . . treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A). An LCA is merely an expression by the MAC of how it will apply the statutory "reasonable and necessary" standard. 42 U.S.C. 1395ff(f)(2)(B). Indeed, an LCD or LCA is not even binding on Qlarant. 42 U.S.C. § 1395ff(c)(3)(B)(ii)(II). LCDs and LCAs narrowly avoided being invalidated as underground regulation. *See Agendia, Inc. v. Becerra*, SA CV 19-00074 DOC (JDEx) (C.D. Cal. Feb. 8, 2022).

Study of the literature cited in the applicable LCA does not show scientific support for the notion that non-pain management specialists who may be treating the underlying etiology of a patient's pain should be relied upon for a determination that other treatments have failed and that there are no alternatives to IT. Indeed, it is obviously below the standard of care to rely on non-pain management specialists to appraise and evaluate the potential efficacy of interventional pain management modalities like IT. As the Department of Health & Human Services has observed: "[a] comprehensive assessment by a skilled pain specialist is necessary to identify which procedure is indicated for a given patient's pain syndrome." (Attachment 53, HHS *Pain Management Best Practices Inter-Agency Task Force Report* (2019), at 36).

However, as explained above, whether the LCA is strictly enforced as a measure of whether fraud has occurred or not, your firm simply has the facts wrong.

**Claim 2**
Claim Control No. 551120280748160
Patient: B[redacted], N[redacted]
Date of Service: September 19, 2020
Qlarant Claim: Services Were Medically Unnecessary

This patient had care prior to and concurrently with her treatment by the provider with orthopedists and neurosurgeons. This is amply catalogued in the patient's medical record and could be verified with the records of other providers. The patient was already status post lumbar laminectomy fusion when she was referred to the provider.

The patient was evaluated by an orthopedic surgeon who advised her that she could not seek surgery orthopedically until evaluated by a neurosurgeon (with the provider noting that she was "losing hope as the pain is increasing and her quality of life is decreasing"). (Attachment 54, DOS Oct. 6, 2017). She had previously been evaluated by neurosurgery. *Id.* The patient reported she was "seeking treatment with a new [orthopedic surgeon] regarding her right shoulder pain as well as a neurosurgeon regarding the increased pain in her cervical spine"—all to no avail. (Attachment 55, DOS Jan. 4, 2018). She was evaluated by orthopedic surgeon, Ryan Leek, M.D. (Attachment 56, DOS Feb. 5, 2018). She was reported as having sought care in the past with pain management physicians, family physicians, spine surgeons, physical therapists and neurosurgeons. (Attachment 57, DOS Mar. 5, 2018). However, the patient made

it clear that she had no desire for orthopedic or neurosurgical alternatives. The patient reported that her neurosurgeon believed that he had a "fix" for her lower back pain but that the patient wanted to speak with the provider first "before letting anyone touch her back ever again"—having been diagnosed with failed back surgical syndrome. (Attachment 58, DOS Ap. 23, 2019). The "fix" mentioned by the spine surgeon was never pursued after he further considered her past surgical history (which included a lumbar fusion L2-5 with pedicle screws following a tumor removal, total knee replacement, and bilateral foot surgery) and studied her chart.

Orthopedic and neurosurgical alternatives did not exist for this patient—a patient who made it clear that she had consulted with both specialties and had no desire for further orthopedic surgical misadventure. The notes also indicate that the patient received 80-90% pain relief that lasted for a week. She had also tried and failed a posterior epidural stimulation prior to the pump implantation. It can hardly be said that, in these circumstances, there is any indicia of fraudulent conduct on the part of the provider—absent some belief on the part of your firm that the provider should have cruelly ignored the patient and consigned her to continued, failed orthopedic pursuits.

On December 12, 2012, the patient underwent facet joint injections. This was repeated on February 12, 2013. An epidural was attempted on February 26, 2013 and repeated February 26, 2013. On August 27, 2013, the patient underwent additional fact joint injections.

On July 13, 2017, a facet joint injection was performed. On August 1, 2017, the patient underwent an injection.

On September 18, 2018, the patient underwent another facet joint injection and again on October 30, 2018 and November 19, 2018.

On May 31, 2019, the patient received an injection and a facet joint injection followed on December 4, 2019.

On January 10, 2020, a facet joint injection was performed.

It wasn't until May 6, 2020, that an IT pump trial (a weeklong test to determine whether the modality will be efficacious for and tolerated by the patient) was attempted after all other modalities did not effectively treat her pain.

**Claim 4**
Claim Control No. 55182307036860
Patient: S[redacted], C[redacted]
Date of Service: October 3, 2020
Qlarant Claim: Services Were Medically Unnecessary

Among other diagnoses, this patient was diagnosed with degenerative joint disease of the lumbar spine, reflex sympathetic dystrophy/comprehensive regional pain syndrome, opioid hyperalgesia, and *presented to the provider with an IT pump already implanted in 2011.*

(Attachment 59, DOS Oct. 30, 2017). **Notably, the implantation occurred *before* the effective date of the LCA you seek to apply.**

The patient's *reimplantation* occurred on October 3, 2020 (Attachment 60, DOS Oct. 3, 2020) after the patient had encountered, among other things, a catheter occlusion with her prior pump (Attachment 61, DOS Aug. 8, 2013) and a pump migration (Attachment 62, DOS Jan. 20, 2015). On March 11, 2014, an intraarticular injection was provided (Attachment 63, DOS Mar. 11, 2014). This was repeated on June 3, 2014 (Attachment 64, DOS June 3, 2014) and again on June 25, 2014 and July 9, 2014 (Attachment 65, DOS June 25, 2014; Attachment 66, DOS July 9, 2014). This reimplantation followed unsuccessful efforts through alternative procedures and treatments. Notably, the patient was independently evaluated by a pain management provider at the University of California at San Diego Medical Center who concluded that the patient had a *massive* opioid tolerance and who made no criticism or mention of the use of the IT interventional modality given the patient's complex presentation (Attachment 67, DOS May 11, 2017).

**Claim 6**
Claim Control No. 5511202905591030
Patient: B[redacted], B[redacted]
Date of Service: October 3, 2020
Qlarant Claim: Services Were Medically Unnecessary

The patient stated a desire to proceed with an IT pump trial once authorization is obtained (notably, authorization for implantation was obtained for all of the patients in whom the provider implanted the IT modality). This desire was expressed at a time when the patient reported constant 10/10 pain with an inability to walk. (Attachment 68, DOS Dec. 9, 2013). The patient was under the concurrent care of an orthopedic surgeon. (Attachment 69, DOS Feb. 15, 2016).

This patient had been a longstanding pump patient (*see* Attachment 70, DOS May 17, 2016 (Weeklong IT Trial)). Prior to the date of service at issue, the patient had another pump trial (Attachment 71, DOS Feb. 26, 2020).

The patient had tried and failed consistent pain relief with oral medications and with injections (*see, e.g.*, Attachment 72, DOS Jan. 2, 2013). As the provider noted prior to initiating the pump trial and the implantation that occurred on the date of service at issue:

> Given the fact that the patient has tried and failed all conservative treatment which includes medication management as she is at the highest regimen possible that allows her to have only about 40% pain relief which causes her to have gasto[intestinal] problems. Land based therapy including multiple lumbar epidurals followed with nerve blocks were unsuccessful. Patient has also tried multiple sessions of physical therapy [to] help strengthen the core muscles which was unsuccessful. Please note Tricare had once approved the Pump trial back in 5/17/2016 which [the] patient admits it allowed her to feel 75% relief which

allowed her to function without medications and was able to have a normal quality of life.

(Attachment 73, DOS Jan. 30, 2020).

**Claim 8**
Claim Control No. 551120294247110
Patient: B[redacted], A[redacted]
Date of Service: October 3, 2020
Qlarant Claim: Services Were Medically Unnecessary

This patient had tried but failed to resolve her pain with treatment involving pain management specialists, family physicians, physical therapists, orthopedists and an orthopedic surgeon, with years of inconsistent relief from long term oral opioid use. (Attachment 74, DOS Jan. 24, 2020). Years of prior efforts to treat the patient's pain had been unsuccessful. (Attachment 75, DOS July 19, 2021).

***The documentation noted the pump was analyzed and filled by a registered nurse but was signed by the physician as the rendering provider (as to claim 2).***

**Claim 2**
Claim Control No. 551120280748160
Patient: B[redacted], N[redacted]
Date of Service: September 19, 2020
Qlarant Claim: Services Were Medically Unnecessary

The care provided by the Registered Nurse in filling the IT pump was provided under the physician's direct supervision. (Attachment 76, DOS Sept. 19, 2020). He was, therefore, the rendering provider because he was immediately available to furnish assistance and direction throughout the performance of the procedure. 42 C.F.R. § 410.32(b)(3)(ii).

***There was no informed consent signed by the beneficiary for the services billed (as to claims 2, 4, 6, and 8).***

All of the provider's patients sign both a consent to treat at the outset of their care, consents related to surgical procedures and opioid agreements that include an appraisal of the potential risks and complications of their treatment and their consent to treat. All of the provider's chart notes indicate dialogue with the patients concerning potential risks and benefits of particular treatments and patient consent.

The consents each patient signs include a pump implant consent (Attachment 77) and a consent to IT treatment (Attachment 78, DOS Sept. 17, 2018). Consent can also include consents for a pump replacement procedure or a catheter revision (Attachment 79 (replacement) and Attachment 80 (catheter revision).

It should be noted that surgical consents are the property and a part of the *surgery center* chart and are not typically kept in the provider's medical records.

Every IT patient signs a consent with the provider which states, among other things:

> I understand and agree that administration of the above intraspinal dug therapy may be associated with certain side effects and/or adverse effects. The most serious side effects include, but are not limited to: respiratory depression, myoclonus, coma, hospitalization, and even death.
>
> . . . .
>
> I understand and agree that possible mechanical complications with the Intrathecal Infusion system may include . . . programming errors, refill errors, pocket problems, or problems with the pump itself.
>
> . . . .

(Attachment 78, DOS Sept. 17, 2018).

**Claim 2**
Claim Control No. 551120280748160
Patient: B[redacted], N[redacted]
Date of Service: September 19, 2020
Qlarant Claim: Services Were Medically Unnecessary

This patient signed a consent for the date of service at issue.

**Claim 4**
Claim Control No. 55182307036860
Patient: S[redacted], C[redacted]
Date of Service: October 3, 2020
Qlarant Claim: Services Were Medically Unnecessary

This patient signed a consent for the date of service at issue.

**Claim 6**
Claim Control No. 5511202905591030
Patient: B[redacted], B[redacted]
Date of Service: October 3, 2020
Qlarant Claim: Services Were Medically Unnecessary

This patient signed a consent for the date of service at issue.

Qlarant Integrity Solutions, LLC
Attn: Jaysen Eisengrein
UPICW Rebuttal and Suspension Department
February 25, 2021

**Claim 8**
Claim Control No. 551120294247110
Patient: B█, A█
Date of Service: October 3, 2020
Qlarant Claim: Services Were Medically Unnecessary

This patient signed a consent for the date of service at issue.

As is amply demonstrated by the record, there is no fraud at play here on the part of the provider. Your correspondence attempts to avoid the meaning of the word "fraud" in a circular way but the definition of the term is important to an evaluation of whether suspension of the provider is appropriate. You appear to take the position that *allegations* of fraud—even when debunked by evidence—are sufficient to maintain a suspension. That position is facetious at best. Your firm cannot plug its ears and close its eyes to maintain an illegal suspension by claiming that *allegations* are enough. Indeed, to be *credible allegations*, those allegations must withstand scrutiny. As is show by the evidence presented, allegations of fraud are not credible and do not show indicia of reliability (42 C.F.R § 405.370(a)(3)). They are themselves fraudulent and therefore a fraudulent basis for the denial of claims by suspension of the provider.

In light of the foregoing, Qlarant should immediately terminate the Provider's Medicare suspension. If you have any questions or need additional information, please let me know.

Very truly yours,
**LAW OFFICES OF MATTHEW D. RIFAT, APC**

Matthew D. Rifat

Qlarant Integrity Solutions, LLC
Attn: Jaysen Eisengrein
UPICW Rebuttal and Suspension Department
February 25, 2021

cc:    Noridian JE Part B, Attn: Provider Suspension
Post Office Box 6775, Fargo, North Dakota  58108-6775

Noridian JE, Part B, Attn: Fraud and Abuse/Benefit Protection
Post Office Box 6710, Fargo, North Dakota  58108-6710

HHS, OIG, OI, Attn: Exclusions Branch
Post Office Box 23871, Washington, District of Columbia  20026

Rebecca Kanter, Esq., Assistant United States Attorney, S.D. Cal.
880 Front Street, San Diego, California 92101

Hon. Patty Murray
Chairman, U.S. Senate Committee on Health, Education, Labor & Pensions

Hon. Richard Burr
Ranking Member, U.S. Senate Committee on Health, Education, Labor & Pensions

Hon. Frank Pallone, Jr.
Chairman, U.S. House Committee on Energy & Commerce

Hon. Cathy Morris
Ranking Member, U.S. House Committee on Energy & Commerce

Hon. Xavier Becerra
Secretary, U.S. Department of Health & Human Services

Chiquita Brooks-LaSure
Administrator, Centers for Medicare & Medicaid Services

Medicare Beneficiary Ombudsman

Region 9 Office for Centers for Medicare & Medicaid Services
Division of Financial Management [ROSFOFM@cms.hhs.gov]
Western Consortium Contractor Management [WCCMS@cms.hhs.gov]
Division of Medicare Health Plan Operations [ROSFODHPP@cma.hhs.gov]

# ATTACHMENT 1.

Unified Program Integrity Contractor
Western Jurisdiction (UPIC W)

Delivery Method: Federal Express

February 8, 2022

Matthew D. Rifat, Esq.
Law Offices of Matthew D. Rifat, APC
3703 Camino Del Rio South, Suite 200
San Diego, CA 92108

**Re:** San Diego Comprehensive Pain Management Center
**Provider/Supplier Medicare ID Number(s):**
**Provider/Supplier NPI Number:**
**Reference Number:**

Dear Mr. Rifat:

This letter is in response to the correspondence, dated November 18, 2021, titled "Provider Rebuttal and Demand for Termination of Suspension of Medicare Payments" (referenced herein as "rebuttal"), and the correspondence, dated January 12, 2022, titled "Notice of CMS Default & Non-Compliance with 42 C.F.R. § 405.375(b)(2)," that you submitted to Qlarant Integrity Solutions, LLC ("Qlarant"), the Unified Program Integrity Contractor ("UPIC") for Medicare Program Integrity in the Western jurisdiction, on behalf of your client, David J. Smith, M.D., and his practice, San Diego Comprehensive Pain Management Center, Inc. ("SDCPMC"), regarding the suspension of SDCPMC's Medicare payments, which took effect on September 7, 2021.[1]

Prior notice of the suspension was not provided because giving prior notice would place additional Medicare funds at risk and hinder the ability of the Centers for Medicare & Medicaid Services ("CMS") to recover any determined overpayment. *See* 42 C.F.R. § 405.372(a)(3).

On November 22, 2021, and January 18, 2022, respectively, Qlarant received your rebuttal and January 12, 2022, correspondence, and forwarded them to CMS. As stated in Qlarant's response, dated November 16, 2021, to your previous correspondence regarding this payment suspension, CMS is responsible for determining if a suspension of Medicare payments is warranted under applicable federal regulations and, as appropriate, whether and when a suspension may be terminated. *See* 42 C.F.R. § 405.375.

As stated in the Notice of Suspension ("Notice"), dated October 22, 2021, the suspension of Medicare payments to SDCPMC is based on credible allegations of fraud. *See* 42 C.F.R. § 405.371(a)(2). Specifically, the suspension of SDCPMC's Medicare payments is based on, but not limited to, information that SDCPMC misrepresented services billed to the Medicare

[1] An interim response to the correspondence submitted November 18, 2021 was provided on December 3, 2021, in accordance with Chapter 8 of the Medicare Program Integrity Manual (CMS Pub. 100-08 or "MPIM"), Section 8.3.2.2.5.

28464 Marlboro Avenue • Easton, Maryland 21601-2732
866.269.3494 • www.qlarant.com

program. More particularly, CMS has credible allegations that SDCPMC submitted claims to Medicare for services that were medically unnecessary.

With the rebuttal, you provide various exhibits and assert, on behalf of SDCPMC, the following statements for consideration (many of which were already addressed in Qlarant's response, dated November 16, 2021, to your previous correspondence), which CMS addresses individually:

1. ***"…there is no indicia of fraud."***

   ***"The Provider is not engaged in any misconduct or fraud."***

   ***"…there is no evidence of any conceivable fraud or abuse on the part of the Provider in connection with their treatment of patients with intrathecal pain pumps or otherwise."***

   ***"For the claim of 'fraud' to fit the suspension, you must have evidence that the Provider knowingly and willfully executed or attempted to execute a scheme or artifice to defraud a health care benefit program…. [in violation of 18 U.S.C. § 1347(a)]."***

Federal law explicitly authorizes the suspension of Medicare payments to providers and suppliers in cases of suspected fraud. *See* 42 U.S.C. § 1395y(o) and 42 C.F.R. § 405.371(a)(2). CMS does not agree that SDCPMC has complied with Medicare rules. CMS refers you to the discussion in the Notice, dated October 22, 2021, as well as Qlarant's response, dated November 16, 2021, to your previous correspondence regarding this payment suspension.

And in particular, the criminal statute 18 U.S.C. § 1347(a) is not applicable to this payment suspension matter. As previously discussed in the Notice dated October 22, 2021, this payment suspension is based on credible allegations of fraud. CMS regulations control here and define credible allegations of fraud as an allegation from any source including, but not limited to, fraud hotline complaints, claims data mining, patterns identified through audits, civil false claims cases, and law enforcement investigations. *See* 42 C.F.R. § 405.370(a). Allegations are considered to be credible when they have indicia of reliability. *See* 42 C.F.R. § 405.370. Such credible allegations are described in the Notice dated October 22, 2021.

CMS has credible allegations that SDCPMC has misrepresented services billed to the Medicare program through submission of claims for medically unnecessary services; therefore, CMS must exercise its authority to protect the Medicare program funds and conduct further investigation of SDCPMC's billing.

2. ***"…suspension threatens closure of the Provider's pain management practice and threatens the health, safety and lives of a large number of Medicare patients in addition to non-Medicare patients."***

   ***"The Provider's suspension… poses a real and immediate danger to the life, health and safety of Medicare beneficiaries. Specifically, those Medicare beneficiaries who***

***are being treated through the use of intrathecal pain pumps are at risk for death or other serious consequences as a result of opioid withdrawal, reversion to oral opioids that are subject to diversion or abuse, and interruption of their longstanding medical treatment."***

***"If the suspension… is not immediately resolved and lifted, the Provider and its patients will suffer immediate and irreparable injury, loss and damage, as follows:***

> ***a. The Provider will be forced to close its operations because of insolvency or bankruptcy;***
> ***b. The Provider will be unable to provide life-saving medical care to its patients;***
> ***c. The Provider… will be unable to care for its 84 pump patients and those patients, in turn, will have nowhere to go to receive treatment because of the decimation of pain management physicians by regulatory and law enforcement action in Southern California… and***
> ***d. The Provider's ability to provide continuity of care to vulnerable pain patients who suffer chronic pain is jeopardized."***

***"California and law enforcement have apparently obliterated the pain management community. This means that the Provider's patients, who depend on their care, are effectively being shut out of the life-saving treatment given to them and face the very real potential of dying as a result."***

CMS is very sensitive to the needs of Medicare beneficiaries and does not agree that suspension of SDCPMC's Medicare payments will jeopardize the ability of SDCPMC's patients to access pain treatment services and potentially endanger their health. CMS has reviewed beneficiary access to pain management services in the San Diego area and has determined there are over 100 doctors and clinicians offering pain management services to Medicare beneficiaries in the area served by SDCPMC; therefore, beneficiaries currently served by SDCPMC will be able to access such services. Thus, CMS has determined that suspension of SDCPMC's Medicare payments is warranted during the ongoing investigation.

3. ***"...an analysis of the medical records for the claims which Qlarant's October 22, 2021 correspondence asserts 'provide evidence of [its] findings and serve as a basis for the determination to suspend [the provider's] Medicare payments....' ...evidence that suspension is entirely inappropriate."***

   ***"The Provider has complied with each of the requirements outlined in [Noridian Local Coverage Article Implantable Infusion Pumps for Chronic Pain (A55239)] since its adoption."***

Qlarant has reviewed the documentation SDCPMC submitted for each of the nine example claims listed in the Notice, as well as the medical record analysis within your correspondence, and has determined that the documentation provided is insufficient to establish that the services provided were reasonable and medically necessary as required by 42 U.S.C. § 1395y, and does not support compliance with Medicare coverage guidelines, including Noridian

Healthcare Solutions Local Coverage Article: Billing and Coding: Implantable Infusion Pumps for Chronic Pain (A55239). These determinations are based on findings that:

- The documentation did not include a progress or procedure note for the date of services at issue (as to claims 1, 3, 5, 7, and 9).
- The billing noted the Service Facility Location Information was for another facility (as to claims 1, 3, 5, 7, and 9).
- The documentation did not support that oral or subcutaneous medication treatments were ineffective or complicated by unacceptable side effects (as to claims 2, 4, 6, and 8).
- The documentation did not support the failure of other treatment modalities (as to claims 2, 4, 6, and 8).
- The documentation did not include an evaluation by a specialist familiar with the underlying disease to validate failure of other treatment modalities and that no other reasonable options were available (as to claims 2, 4, 6, and 8).
- The documentation noted the pump was analyzed and filled by a registered nurse but was signed by the physician as the rendering provider (as to claim 2).
- There was no informed consent signed by the beneficiary for the services billed (as to claims 2, 4, 6, and 8).

Payment suspension enables CMS to protect program funds while the government completes its investigation. The ongoing investigation, which has included medical review, as well as other investigative activities, has revealed credible allegations that SDCPMC misrepresented services billed to the Medicare program. Again, credible allegations of fraud are defined to include an allegation from any source including, but not limited to, fraud hotline complaints, claims data mining, patterns identified through audits, civil false claims cases, and law enforcement investigations. Allegations are considered to be credible when they have indicia of reliability. *See* 42 C.F.R. § 405.370. Qlarant's medical review findings fall within the definition of "[c]redible allegation of fraud" at 42 C.F.R. § 405.370(a).

4. ***"The reimbursement methodology used and the documentation and treatment disclosed by the Provider show complete compliance with Medicare rules and, indeed, Medicare and Qlarant have endorsed a finding of compliance in their disposition of nearly all of the audits and prepayment reviews of the Provider in its favor."***

   ***"Since 2009,* for the past twelve years, *the Provider has worked with Medicare and its Medicare Administrative Contractors, Palmetto and Noridian (as Palmetto's successor), to resolve intermittent interruptions in the Provider's reimbursement for pump medications. Based on the suspension, those interruptions now appear to have been part of a pattern of misbehavior by the MACs or Medicare contractors to void reimbursement for intrathecal pain pumps."***

   ***"In 2010, the Provider and Palmetto agreed upon a reimbursement method for medications used to fill the pain pumps. That method was ratified by Noridian, which adopted an express reimbursement formula in 2013."***

*"The correspondence [dated January 7, 2020, from SDCPMC's attorney to Palmetto and included with the rebuttal as Attachment 6] focused squarely on the issues that appear to have reappeared here…."*

*"In… correspondence… [from Palmetto to the Provider] …, including the adoption of a reimbursement policy, CMS established definitively the means by which pump medications would be reimbursed. The Provider has followed that reimbursement methodology and has not engaged in any misconduct relative to treatment of patients with intrathecal pain pumps and medication and billing for the services or, for that matter, with any other patients or treatment."*

*"… the Provider has been repeatedly audited and even subjected to pre-payment review in which Medicare withheld payment until it reviewed and evaluated evidence related to the providers' billing (which it did through Qlarant). … None of those [audits and reviews] has resulted in any claim of fraud or other misconduct. …in September, 2018, the Provider produced thousands of pages of medical records relating to pump billing and treatment of their patients in response to an administrative subpoena by the United States Department of Justice Drug Enforcement Administration."*

*"The Provider was repeatedly audited or reviewed in connection with its pump services. … None of those activities resulted in a determination of incorrect billing or coding, lack of medical necessity or other justification for denial of reimbursement for the Provider."*

*"The February 2017 [Noridian Redetermination] decision… concluded that, as to Dr. Thompson* **but not the Provider or any other physician providing he** *[sic]* **same services,** *there was no medical necessity for pump fills despite having been approved and reimbursed for years in pumps whose implantation had been approved and reimbursed by the MAC. … The appeal of that decision for hearing before an Administrative Law Judge has been pending for nearly four years."*

*"… The appeal of one denied prepayment review claim [that was ultimately determined in the Provider's favor] illustrates the lack of any foundation for claims of fraud or abuse meriting suspension."*

*"[A Qlarant] pre-payment review… was ultimately lifted without any claim of fraud." "In October of 2020, Qlarant issued a number of claims denials... claiming a 100% error rate. ... However, those findings were challenged and the claims ultimately paid."*

The above assertions do not preclude further claim review by CMS and its contractors. Further, prior findings and appeal results do not invalidate Qlarant's review findings relevant to the claims that are currently at issue. Again, the relevant Qlarant review findings are discussed in the Notice, dated October 22, 2021, and Qlarant's response, dated November 16, 2021, to your previous correspondence regarding this payment suspension, as well as this response to the rebuttal.

Finally, in your correspondence, dated January 12, 2022, you assert that, because written notice of the determination whether the facts justify the termination of the suspension was not provided within 15 days of Qlarant's receipt of the SDCPMC November 18, 2021, rebuttal, "CMS and Qlarant are estopped... from asserting that their suspension of the provider's payments were [*sic*] justified."

As an initial matter, CMS notes that you also previously submitted, on behalf of SDCPMC, correspondence dated September 16, 2021, identified as a "Rebuttal Letter"; that CMS provided an interim response to on September 29, 2021; and that CMS provided a final response on November 16, 2021, to that September 16, 2021 "Rebuttal Letter." Notably, CMS regulations do not authorize more than one rebuttal statement. However, CMS reviews and considers all information submitted.

In any event, 42 C.F.R. § 405.375 states, in relevant part:

> (a) Submission and disposition of evidence. If the provider or supplier submits a statement, ..., under § 405.372(b)(2), why a suspension should be terminated, CMS, the intermediary, or carrier must within 15 days, from the date the statement is received, consider the statement (including any pertinent evidence submitted), together with any other material bearing upon the case, and determine whether the facts justify the suspension, offset, or recoupment or, if already initiated, justify the termination of the suspension, offset, or recoupment. Suspension, offset, or recoupment is not delayed beyond the date stated in the notice in order to review the statement.
>
> (b) Notification of determination. The Medicare contractor must send written notice of the determination made under paragraph (a) of this section to the provider or supplier. ....

Notably, although 42 C.F.R. § 405.375(a) requires, within 15 days, the consideration of a rebuttal and a determination of whether the facts justify the suspension or the suspension's termination, 42 C.F.R. § 405.375(b) *does not* specify that *written notice* of such determination regarding the suspension or the suspension's termination must also be issued within 15 days, nor does 42 C.F.R. § 405.375(a). The CMS regulations do not support the position you took in your January 12, 2022, correspondence. Consequently, CMS does not agree that it is "estopped" from continuing the suspension of SDCPMC's Medicare payments during the ongoing investigation into credible allegations of fraud.

In conclusion, after a careful review of SDCPMC's rebuttal, dated November 18, 2021, and consideration of the materials submitted with it, as well as your correspondence, dated January 12, 2022, CMS has determined that the assertions therein do not justify termination of the determination to suspend Medicare payments to SDCPMC due to credible allegations of fraud. *See* 42 C.F.R. § 405.375. While this determination is not appealable, CMS will consider any additional information and/or evidence you may submit on behalf of SDCPMC.

If you have any questions, please direct your written inquiry to adminactions_upicw@qlarant.com.

Sincerely,

Jaysen Eisengrein, MBA, PgC, BS
Senior Vice President, Program Director - UPICW
Qlarant Integrity Solutions, LLC

# ATTACHMENT 2.

**PACIFIC SURGICAL INSTITUTE**

3703 CAMINO DEL RIO SOUTH, 101, SAN DIEGO CA 92018 - 4033

Tel: 619 640-1555, Fax: 619 604-9581

**PROGRESS NOTE**

| Patient First Name: | Patient Last Name: | Date of Birth: | Sex: |
|---|---|---|---|
| R | G | | Male |
| **Attending Provider:** | **Referring Provider:** | **Visit Date:** | **Chart No.:** |
| David Smith MD | Lucian Oprea | 02-13-2020 | ECL05278 |

**Past Medical History**
S/P implantation of urinary electronic stimulator device Z96.0 (V45.89) malfunction . Long term (current) use of opiate analgesic Z79.891 (V58.69) . Arthritis, multiple joint involvement M12.9 (716.99) since 01-15-2019. Uncomplicated opioid dependence F11.20 (304.00) . Prostate cancer C61 (185) . Prostate tumor D49.59 (239.5) . Cervical radiculopathy M54.12 (723.4) . Lumbar radiculopathy M54.16 (724.4) . Arthritis M19.90 (716.90) . Status post lumbar laminectomy Z98.890 (V45.89) . Bulging lumbar disc M51.26 (722.10) . Balanitis N48.1 (607.1) . Malfunction of spinal cord stimulator T85.192A (996.2) . Encounter for other preprocedural examination Z01.818 (V72.83) since 03-19-2019. Vitamin deficiency E56.9 (269.2) since 04-16-2019. Unilateral primary osteoarthritis, left knee M17.12 (715.16) since 10-15-2019. Unilateral primary osteoarthritis, right knee M17.11 (715.16) since 10-15-2019.

**Surgical History**
Medtronic Pain Pump Implant: 02/13/2020 by David J. Smith, MD at Pacific Surgical Institute
Boston spinal cord stimulator implant- non functional/ paddle shaped
Prostectomy: 2018
Lumbar Fusion (laminectomy ) at San Diego
cervical fusion: 2016 at San Diego
Foot Surgery ( foot) big toe rebuilt by Dr. Gosage at San Diego

**Family History**
Non-contributory Family History.

**Current Medication**
MS Contin 60 mg tablet,extended release 1 Tablet Twice A Day
oxycodone 30 mg tablet 1 Tablet Five Times Daily PRN
pregabalin 75 mg capsule 1 Once A Day
chlorthalidone 25 mg tablet
fenofibrate micronized 134 mg capsule
tizanidine 4 mg tablet 1 Tablet Twice A Day

**Allergy**
Zofran rash and nausea and breathing Allergy .

**Social History**
**Use of Drugs/Alcohol/Tobacco:** Smoking Status (MU) never smoker.
**NQF 0028-Tobacco use counselling:** The patient does not smoke.

**Vitals**

**Vital Statistics: Weight:** 260.00 lbs. **Temperature:** 98.70 deg. F. **Pulse:** 61 per min. **Respiration:** 16breath/min. **BP - Sitting:** 132/58 mmHg. **Pulse Oximetry:** 95.

**Pain Management**

- Intrathecal Catheter/Pump Placement

**Intrathecal Catheter/Pump Placement**

PT ARRIVED TO PSI ON 02/13/20 FOR LEFT PAIN PUMP IMPLANT WITH GENERAL

**Follow up:** No Follow Up

Dulce
Mota
Rendering
Provider

Supervising Provider

Supervising Physician

David
Smith MD,
Physician

Attending
Provider

Supervising Physician

Physician
David
Smith MD

This has been electronically signed on 02-13-2020.

G█, R█ Male █

Page 3

Supervising Physician
David Smith, MD
*This has been electronically signed by David Smith, MD on 02-13-2020.*

G[redacted], R[redacted] Male [redacted]

Session Long Report



Medtronic

Application Version: 1.1.300

Session Date: Feb 13, 2020 8:58 AM

PATIENT AND SESSION INFORMATION

Last Name : G

First Name : R

Patient ID :

Phone 1 : - - - - -

Phone 2 : - - - - -

Birthdate :

Device : SynchroMed™ II; 8637-20

Last Update : 2/13/20 10:48 AM

Address : - - - - -
- - - - -, - - - - - - - - - -
- - - - -

LOW RESERVOIR ALARM

Refill Pump Before: 12/8/20

Low Reservoir Alarm Volume : 2.0 mL

Next Refill Appointment: - - - - -

CHANGES MADE

Implant/Replace Pump session workflow. 1 updates occurred. Changes made in:

- Reservoir volume
- Drug Information
- Infusion
- Notes
- Patient
- Prime Bolus
- Catheter
- Low Reservoir Alarm

ALARM/ALERT OCCURRING

**Beginning of Session**

INFORMATION: The pump is in Shelf State.
Pump will be put into Implant Mode after first successful update.
Service Code: 244

RESERVOIR

| Title | Beginning of Session | Current Settings |
|---|---|---|

**Session Long Report**

R█ G█ ████████

████████████

**Medtronic**

Application Version: 1.1.300

Session Date: Feb 13, 2020 8:58 AM

| Reservoir Volume | ----- | *20.0 mL* |
|---|---|---|

## DRUGS

| Title | **Beginning of Session** | **Current Settings** |
|---|---|---|
| **Primary:** | **Water (1,000.0 mcL/mL)** | ***FENTANYL (23.7 mg/mL)*** |
| Secondary: | ----- | *ketamine (1.2 mg/mL)* |
| | ----- | *MARCAINE (0.1 mg/mL)* |

Is Patient Receiving Systemic Medication? -----

## INFUSION

| Beginning of Session | Current Settings |
|---|---|
| INFORMATION: Pump is in Shelf State. Infusion is set to Minimum Rate (6mcL/day), typically a non-therapeutic dose. | Pump in Implant State. See infusion details below. |

| **Beginning of Session** | | |
|---|---|---|
| **Monday - Sunday : Minimum Rate** | | |
| **Step** | **Duration** | **Water** |
| Step 1: | 12:00 AM - 12:00 AM<br>24 hr | 6.5 mcL<br>(0.3 mcL/hr) |
| | **24 Hour Dose:** | **6.5 mcL/day** |

| **Current Settings** | | | | |
|---|---|---|---|---|
| **Monday - Sunday : Simple Continuous** | | | | |
| **Step** | **Duration** | **FENTANYL** | ketamine | MARCAINE |
| Step 1: | 12:00 AM - 12:00 AM<br>24 hr | 1.399 mg<br>(0.058 mg/hr) | 0.0708 mg<br>(0.0030 mg/hr) | 0.00590 mg<br>(0.00025 mg/hr) |
| | **24 Hour Dose:** | **1.399 mg/day** | 0.0708 mg/day | 0.00590 mg/day |

## PRIME BOLUS

Prime Bolus Scheduled.

Session Long Report

Medtronic

Application Version: 1.1.300

Session Date: Feb 13, 2020 8:58 AM

| | | | |
|---|---|---|---|
| Volume : | 0.326 mL | Start Time : | 2/13/20 10:48 AM |
| Duration : | 0 hr 20 min | End Time : | 2/13/20 11:08 AM |

ALARMS SETTINGS

Critical Alarm Interval : 0 hr 10 min    Non-Critical Alarm Interval : 1 hr 0 min

PUMP

| | | | |
|---|---|---|---|
| Pump Model : | 8637-20 | Calibration Constant : | 111.0 |
| Serial Number : | NGP709721H | Reservoir Max Volume : | 20 mL |
| Estimated Replacement : | Oct 2026 (<81 Months) | Pump Time : | 2/13/20 10:47 AM |

CATHETER

| | | | |
|---|---|---|---|
| Catheter Model : | Other (two piece) | Implanted Volume : | 0.198 mL |
| Implanted Length : | 89.9 cm | | |
| **Pump Segment** | | **Tip Segment** | |
| Catheter vol/cm : | 0.0022 mL/cm | Catheter vol/cm : | 0.0022 mL/cm |
| Original Length : | 66.0 cm | Original Length : | 38.0 cm |
| Length Removed : | 5.0 cm | Length Removed : | 9.1 cm |
| Implanted Length : | 61.0 cm | Implanted Length : | 28.9 cm |
| Implanted Volume : | 0.134 mL | Implanted Volume : | 0.064 mL |

NOTES

Pump implant. Dr D. Smith.
Entry t L4\L5
cath tip at T9\T10
CAP at 3 oclock

**END OF REPORT**



#300448 | Hospira #00409427702

Generic Equivalent to Xylocaine® Lidocaine HCl 2%, 20 mg / mL Infiltration and Nerve Block Injection Multiple Dose Vial 50 mL

- Multiple dose flip-top vial

#239935 | Hospira #00409427601

Generic Equivalent to Xylocaine® Lidocaine HCl 1%, 10 mg / mL Infiltration and Nerve Block Injection Multiple Dose Vial 20 mL

- Multiple dose flip-top vial

## Reviews

## Product Specifications

| | |
|---|---|
| McKesson # | 336182 |
| Manufacturer # | 00409116201 |
| Manufacturer | Hospira |
| Country of Origin | Switzerland |
| Application | Local Anesthetic |
| Container Type | Single Dose Vial |
| Dosage Form | Injection |
| Generic Drug Code | 19758 |
| Generic Drug Name | Bupivacaine HCl, Preservative Free |
| NDC Number | 00409-1162-01 |
| Product Dating | McKesson Acceptable Dating: we will ship >= 90 days |
| Strength | 0.5%, 5 mg / mL |
| Type | Parenteral Solution |
| UNSPSC Code | 51271622 |

DAVID J. SMITH, MD
3703 CAMINO DEL RIO S., STE 210,
SAN DIEGO, CA 92108
FENTANYL 25MG/ML 10ML VIAL
DATE: 2/03/2020
EXPIRATION DATE: 3/03/20
MFR LOT: 20A07-BB03-PR00816
BATCH: 222LP
LOT# 220KLNP
NDC# 38779-1756-02
*FOR INTRATHECAL USE*

DAVID J. SMITH, MD
3703 CAMINO DEL RIO S., STE 210,
SAN DIEGO, CA 92108
FENTANYL 25MG/ML 10ML VIAL
DATE: 2/03/2020
EXPIRATION DATE: 3/03/20
MFR LOT: 20A07-BB03-PR00816
BATCH: 222LP
LOT# 220KLNP
NDC# 38779-1756-02
*FOR INTRATHECAL USE*

David J. Smith, MD
3703 Camino Del Rio South #210
San Diego, CA
Ketamine 25mg/ml 5ml vial
Date: 1/15/20 Exp: 2/15/20
Batch number: 216 Lot# 216BC
MRF Lot number:
16E24-BB01-PR00105
NDC#63275-9980-4

# ATTACHMENT 3.

**PACIFIC SURGICAL INSTITUTE OF PAIN MANAGEMENT**
**DAVID JAMES SMITH, M.D.**
3703 Camino del Rio South, Suite 101
San Diego, California 92108
(619) 640-1555 FAX (619) 640-9581

Patient: G█████, R█

Date of Procedure: February 13, 2020

## ***OPERATIVE PROCEDURE***

PREOPERATIVE DIAGNOSIS: Radiculopathy, lumbar region.

POSTOPERATIVE DIAGNOSIS: Radiculopathy, lumbar region.

OPERATION: 1) Lumbar puncture; 2) thoracolumbosacral myelogram; 3) implantation of Medtronic intrathecal catheter; 4) implantation of Medtronic 20-ml Synchromed II infusion pump; 5) tunneling of catheter from lumbar incision to left lower abdominal quadrant Synchromed Medtronic pump pocket; 6) connection of Medtronic Synchromed infusion pump to connector; 7) anchoring catheter; 8) connection of proximal catheter to Medtronic catheter to Medtronic infusion pump; 9) wound irrigation, lumbar spine and left lower abdominal quadrant; 10) wound closure, lumbar spine and left lower abdominal quadrant region; 11) telemetry analysis and electronic programming of Medtronic 20-ml Synchromed II infusion pump.

Medtronic InDura 8598A, intrathecal catheter Lot # HG3QNRP05
Medtronic Synchromed II 8637-20 Serial # NGP709721H

ANESTHESIOLOGIST: General anesthesia administered by Dr. Donald Rose.

COMPLICATIONS: None.

BLOOD LOSS: Minimal

PROCEDURE: After all risks and benefits were explained to the patient including the risk of death, bleeding, infection, and paralysis, and after informed consent was obtained, the patient was brought into the preoperative area where a peripheral IV was started. The anesthesiologist consulted with the patient. The patient was brought into the surgical suite and placed in a left lateral decubitus position.

Diplomate, American Board of Physical Medicine and Rehabilitation
Diplomate, American Academy of Pain Medicine
Associate, American Board of Electrodiagnostic Testing
Agreed Medical Examiner, State of California

Anesthesia was induced. Refer to anesthesia record for continued medication administration.

The patient was then prepped and draped in the normal fashion. The fluoroscopic beam was brought to the operating room field, and cross-table fluoroscopic visualization was utilized to locate the L4-L5 level. Using sterile technique, the area at L4-L5 was marked with non-removable ink.

A 5.5 inch Medtronic 15-gauge obturator and trocar with beveled tip was brought to the operating field. The marked area was entered through the skin and deep subcutaneous layers and intramuscularis layers. Fluoroscopic pictures showed the tip of the needle entering the T9-T10 ligamentum flavum. The needle was advanced, and the trocar was removed. Clear cerebrospinal fluid exited from the proximal tip of the trocar. Fluoroscopic visualization demonstrated the distal tip of the trocar was subarachnoid.

The catheter was then advanced under fluoroscopy through the trocar and into the subarachnoid space. The tip was cephalad in the subarachnoid space to the L4-L5 level. The stylet was removed without complication.

A needle and syringe containing Omnipaque (300 mg/ml) was brought to the field, and approximately 3 ml of Omnipaque (300 mg/ml) was injected through the Medtronic catheter. Fluoroscopic visualization was then performed, demonstrating a thoracolumbosacral myelogram, confirming subarachnoid placement.

The needle was left in the catheter, and the syringe was changed from Omnipaque to preservative-free normal saline. At this time, preservative-free normal saline was then injected through the catheter to clear the catheter of Omnipaque

The needle was removed from the catheter, and the catheter was secured with a hemostat to the sterile drape. The catheter remained in the trocar and the intrathecal space with the most proximal end of the catheter attached to the sterile drape via hemostat in anticipation of being placed in the aluminum tunneler. Approximately 40 ml of 0.5% Marcaine 1:200,000 were used to anesthetize the incision site. Then a #10 blade was utilized to create a 2-inch incision from cephalad to caudal. The incision was made deep, down approximately one inch from the interspinous ligament, which was palpable. Bleeding was controlled at all times using Bovie coagulation.

The trocar was then removed and the anchor brought down around the catheter and placed upon the deep interspinous ligament. Using 0 Ethibond in the standard fashion, the

RE: G████, R█                                    February 13, 2020
                                                 Page Three

anchor was secured to the interspinous ligament. The catheter integrity was checked and
was non-mobile and secured using the Medtronic anchor. Two additional retaining sutures
were placed just proximal to the anchor site using 0 Ethibond to prevent the anchor from
angulating away from the anterior wound floor. This allowed the anchor to remain flush all
points across the wound floor. The abdominal region was then approached for creation of a
pump pocket in the left lower abdominal quadrant. The appropriate location for
implantation of the pump was marked with a marker. This was approximately 3 inches in
length.

Approximately 40 ml of 0.5% Marcaine 1:200,000 were used to anesthetize the incision
site. Using a #10 blade, a 3.5-inch incision was made. Bleeding was controlled at all times
using Bovie coagulation.

The incision was further deepened using the cut mode of Bovie. Bleeding was controlled at
all times using Bovie coagulation. There was ample adipose tissue which was trimmed.
The pocket was further refined using digital dissection. Once the pocket was secured, it
was inspected for bleeding. There was no evidence of any significant bleeding.

At this point, the lumbar incision was cleaned and dried as was the abdominal incision.

Using the aluminum tunneler provided by Medtronic, this was contoured to the body and it
was inserted through the pump pocket in the right lower quadrant. It was guided above
the skin and directed to the lumbar incision.

This exited the lumbar incision approximately 1 inch cephalad to the Medtronic trocar
containing the catheter still in place. The center guide was removed from the aluminum
tunneler. The catheter was then feed through the lumen of the tunneler. This was done
without complications. The tunneler was then removed from the subcutaneous tract
leaving the catheter subcutaneous and exiting in the pump pocket site of the left lower
quadrant.

The excess catheter had been cut and removed from the field for catheter lumen volume
measurement and calculation for a Medtronic priming bolus dose. The pump had
previously been purged and had been initially programmed and analyzed. At this point, the
pump was brought to the field. The pump was programmed by the Medtronic
representative.

Using the standard technique, the catheter was attached to the pump. The integrity of this
connection was tested and there was an attempt to distract and remove the catheter from

RE: G█████, R█ February 13, 2020
Page Four

the connector and the connector from the pump. Once this was determined to be secure in its connection, the pump was placed in the pocket with the side access port at the 6 o'clock position.

With the pump securely in the pocket, attention was directed to securing the pump to the deep abdominal fascia. Using 0 Ethibond sutures with careful attention not to pierce the existing catheter, the suture was passed through the abdominal fascia and then through the eyelet of the pump. Three eyelets were used, one at the 3 o'clock, one at the 6 o'clock, and one at the 9 o'clock position. Each 0 Ethibond suture was secured in the usual fashion after passage through the abdominal fascia and the respective eyelet of the pump. This prevented the pump from effectively rotating or flipping.

A total of 1,000 ml of normal saline containing 1 g of reconstituted Ancef was used, and the pocket was irrigated with 500 ml of normal saline containing Ancef. The other 500 ml were utilized to irrigate the lumbar incision.

The pocket was closed with 0 Vicryl interrupted sutures, followed by 2-0 Vicryl interrupted sutures, followed by skin staples. The back wound was closed with 0 Vicryl interrupted sutures, followed by 2-0 Vicryl interrupted sutures, and skin staples. Compression dressings were applied. The patient was placed in an abdominal binder.

The patient was stable. The procedure was complete. The patient was transferred to the PACU.

[signature] 2/13/20

David James Smith, M.D. Date — County of San Diego Board Certified

DJS/na
DD: 02/13/20
DT: 02/13/20

Diplomate, American Board of Physical Medicine and Rehabilitation
Diplomate, American Academy of Pain Medicine
Associate, American Board of Electrodiagnostic Testing
Agreed Medical Examiner, State of California

PACIFIC SURGICAL INSTITUTE OF PAIN MANAGEMENT, 3703 CAMINO DEL RIO SO, STE 101, SD, CA, 92108

# PACU RECORD:

TIME IN: 1100 RECOVERY ROOM NURSE: Dulce/Susan

ALLERGIES: Zofran

ANESTHESIA PROVIDER: Dr. Rose ANESTHESIA TYPE: Dr. Rose General TO PACU VIA: ✓ GURNEY __ W/C __ AMB

PROCEDURE: (L) Pain Pump

INITIAL ASSESSMENT:
COLOR: PINK PALE DUSKY RUDDY
DRESSING: DRY/INTACT DRAINAGE N/A
SKIN: WARM/DRY COLD/CLAMMY
LOC: DROWSY REACTIVE/AWAKE RESTLESS

RESPIRATIONS: REG/UNLABORED IRREG/SHALLOW
AIRWAY: O2 3 lpm MASK NASAL CANNULA N/A
OXYGEN D/C at: 1130

IV ASSESSMENT: ~~HEALTHY/NO REDDNESS~~ INFILTRATED/REDDENED
SITE: Rt AC F GAUGE: 22
IV DC AT: 1220 CATH INTACT: ✓ SITE CLEAR: ✓

INTAKE/OR: 900 ML INTAKE/PACU: 200 ML
TOTAL FLUIDS: 1100 ML EBL: <10
TOTAL OUTPUT: Ø ML TYPE:

FUNCTIONAL PAIN LEVEL: 6/1, 6

*VITAL SIGNS:*

| TIME | BLOOD PRESSURE | RESP | SaO2 | TEMP | PULSE | PAIN |
|---|---|---|---|---|---|---|
| ARRIVAL | 129/68 | 16 | 96 | 97.8 | 67 | 0 |
| 1105 | 103/58 | 16 | 96 | | 58 | Ø |
| 1110 | 102/53 | 16 | 100 | | 55 | Ø |
| 1115 | 98/51 | 16 | 98 | | 57 | Ø |
| 1120 | 138/71 | 16 | 99 | 97.9 | 70 | 8 |
| 1125 | 134/77 | 16 | 99 | | 66 | 8 |
| 1130 | 135/76 | 16 | 98 | | 85 | 7-8 |

(ADDITIONAL VITAL SIGNS RECORD ON REVERSE)

*MEDICATIONS:*

| TIME | MEDICATION | DOSE | PAIN SCALE | INIT. |
|---|---|---|---|---|
| 1140 | fentanyl | 25mcg | 8 | O.M |
| | | | | |
| | | | | |
| | | | | |

FSBS: 111

*DISCHARGE ASSESSMENT:*
COLOR: PINK PALE DUSKY RUDDY SKIN: WARM/DRY COLD/CLAMMY
LOC: DROWSY REACTIVE/AWAKE RESTLESS N/V:
DRSG: DRY/INTACT DRAINAGE N/A
PAIN: NONE MILD (1-4) MOD (5-7) SEVERE (8-10)
POST OP INST. TO ✓ PT ✓ FAMILY
BELONGINGS GIVEN TO: ✓ PT __ FAMILY
DISCHARGE CONDITION: ✓ STABLE
DISCHARGE TIME: 1210 WITH: Family

NOTES: Pt is AOx4 Pt. denies N, V, SOB, CP, Dizziness. Pt. can ambulate w/ steady gait to wheelchair.

| ALDRETE SCORE | | ADM | 15" | 30" | D/C |
|---|---|---|---|---|---|
| Able to move 4 extremities<br>Able to move 2 extremities<br>Able to move 0 extremities | 2<br>1<br>0 | 2 | 2 | 2 | 2 |
| Able to deep breath and cough<br>Dyspnea or limited breathing | 2<br>1 | 2 | 2 | 2 | 2 |
| B/P +/- 25% pre-anesthesia level<br>+/- 25-50%<br>+/- 50% | 2<br>1<br>0 | 2 | 1 | 2 | 2 |
| Awake and Oriented<br>Arousable on call<br>None responsive | 2<br>1<br>0 | ~~2~~ 1 | 2 | 2 | 2 |
| Normal color<br>Pale, Dusky, Blotchy, Jaundice<br>Cyanotic | 2<br>1<br>0 | 2 | 2 | 2 | 2 |
| Post Anesthesia Score (Must be 8-10 to be discharged) | | 8 | 9 | 10 | 10 |

MD EVALUATION & DISCHARGE: ALL DISCHARGE CRITERIA HAVE BEEN MET AND PT MAY BE DISCHARGED PER FACILITY POLICY.

MD SIGNATURE: [signature] DATE/TIME

RN SIGNATURE: DATE/TIME

G[redacted], R[redacted]
DOB: [redacted]

DOS: 02/13/2020
DR. SMITH

PACIFIC SURGICAL INSTITUTE / PAIN MANAGEMENT, 3703 CAMINO D. _ RIO SO, STE 101, SD, CA, 92108

| COUNT N/A | INITIAL COUNT | PERITONEAL COUNT | FINAL COUNT |
|---|---|---|---|
| LAP SPONGES | 5 | | 5 |
| RAYTEX | | | |
| SUTURE NEEDLES | 8 | | 8 |
| BLADES | 1 | | 1 |
| NEEDLES | 7 | | 7 |

WT: 260 AGE: 59

MEDICATIONS:

| AGENT: ⇩ TIME: ⇨ | | | | | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| OXYGEN (lpm) | | | | | | | | | | |
| DEMEROL (MG) IV | | | | | | | | | | |
| DILAUDID (MG) IV/IM | | | | | | | | | | |
| VERSED (MG) IV | | | | | | | | | | |
| FENTANYL (MCG) IV | | | | | | | | | | |
| ANCEF (GM) IV | | | | | | | | | | |
| OTHER | | | | | | | | | | |

**PROCEDURE MEDICATIONS:**

LIDO ___ % ___ MPF ___ W/EPI ___ ML MARCAINE ✓ 0.25% ___ 0.5%: — W/EPI ___ PLAIN 40 ML

OMNIPAQUE: ___ ML KENALOG 40MG/ML ___ ML PF NaCl ___ ML DEXAMETHASONE ___ ML

METHYL-P 40MG/ML ___ ML TORADOL 30MG/ML ___ ML

| TIME | BP | CARDIAC RHYTHM | 02 SAT | RESP | LOC ** |
|---|---|---|---|---|---|
| See | Anesthesiologist | | | | — |
| | | Record | | | — |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

NOTES/NURSING CONCERNS: (L) Pain Pump.

IMPLANT STICKERS:

Medtronic 8596A Intrathecal Catheter Spinal Segment Revision Kit
Lot No.: HG3QNFC09

Medtronic 8596SC Intrathecal Catheter Pump Segment Revision Kit
Lot No.: HG3QNRP05

Medtronic 8637-20 Calibration Constant 111 SN NGP709721H Serial number

Entered @ L4-L5

Leads span: ___

Catheter tip @ T9-T10

IPG/PUMP placed on RT. / (LT.) Side Access @ Umbilicus (R)

**
2 Awake and oriented
1 Arousable with minimal stimulation
0 Responsive only to tactile stimulation

DISCHARGED/OR at: 1035 AMBULATING W/O ASSIST: ___ PAIN LEVEL: 6/10

TRANSFER/PACU at: 1055 VIA GURNEY. LOC: ✓ A&OX4 ✓ REACTIVE/(SLEEPY) ___ NON RESPONSIVE

TRANSFERRED W/ ___ MD [signature] ___ RN

RN SIGNATURE: [signature] RN DATE/TIME: 2.13.20 1055

G[redacted], R[redacted] DOS: 02/13/2020
DOB: [redacted] DR. SMITH

PACIFIC SURGICAL INSTITUTE OF PAIN MANAGEMENT, 3703 CAMINO DEL RIO SO, STE 101, SD, CA, 92108

**SUPERBILL** PROCEDURE: PUMP IMPLANT    INSURANCE: *WC MC TRI PPO LIEN HMO CASH*

| QTY | GENERAL SUPPLIES | QTY | GENERAL SUPPLIES | QTY | GENERAL SUPPLIES |
|---|---|---|---|---|---|
| 1 | PULSE OXIMETER | | ARM SLING | | Fentanyl 50mcg/ml 2ml |
| 1 | EKG ELECTRODES | | ABDOMINAL BINDER | | Midazolam/ Versed 1mg/ml 2ml |
| 1 | IV START KIT | | BEDPAN/URINAL/EMESIS BASIN | | Dilaudid 4mg/ml 1ml |
| 1 | IV CATHETER | | | | Demerol 25mg/ml 1ml |
| 1 | IV SOLUTION | 1 | Oxygen | | Demerol 50mg/ml 1ml |
| 1 | OXYGEN MASK/CANNULA | 1 | Nitrous Oxide | | Morphine 10mg/ml 1ml |
| 1 | ANES SUPPLIES & EQUIPMENT | | Ultane | | Percocet 5/325 tab |
| | EPIDURAL TRAY | 1 | Propofol/Diprivan 10mg/ml 20ml | | |
| | SPINAL NEEDLE | | Vecuronium Bromide/Norcuron 10mg | | Ativan 2mg/ml 1ml |
| | CHIBA NEEDLE | 1 | Rocuronium Bromide/Zemuron 10mg/ml 5ml | | Regular Insulin U100 10ml MDV |
| | NERVE BLOCK NEEDLE SET | | Cisatracrium Besylate /Nimbex 2mg/ml 10ml | | Bicitra MDV |
| | DISCOGRAM SYRINGE | 1 | Succinylcholine/Anectine 20mg/ml 10ml | | |
| | RF GENERATOR | | Neostigmine 1:1000 1mg/ml 10ml | | Vistaril 50mg/ml 1ml |
| | RF GROUNDING PAD | | Robinul 0.2mg/ml 2ml | | Benadryl 50mg/ml 1ml |
| | RF NEEDLES | | Atropine 1mg/ml 1ml | | Solu-cortef 100mg |
| | HOLMIUM LASER | | Phenylephrine 10mg/ml 1ml | | Solu-medrol 1GM |
| | MICRODISCECTOMY EQUIP | | Physostigmine | | Heparin Flush 100units 10ml |
| | LASER FIBER | | Labetalol 5mg/ml 20ml MDV | | Albuterol Inhaler |
| | EMG MACHINE,LEAD,NEEDLES | | Lopressor 5mg/ml 5ml | | Albuterol Inhalation Solution (nebulizer) |
| | VERTEBROPLASTY KIT | | Lasix 10mg/ml 4ml | | |
| | PERCUT EPIDURAL CATHETER | | Apresoline 20mg/ml 1ml | | Lidocaine 1% plain 50ml |
| | PERCU-STAY FASTENER | | Lanoxin/Digoxin 500 mcg 2ml | | Lidocaine 1% w/epi 50ml |
| | MICRO-JET PUMP & CASSETTE | 1 | Ephedrine 50mg/ml 1ml | | Lidocaine 1% w/epi—MPF 10ml |
| | SPINAL ENDOSCOPY EQUIP | | Metochlopramide HCL/Reglan 10mg 2ml | | Lidocaine 1% plain—MPF 2ml |
| | BALLOON CATHETER | | Ondansetron / Zofran 2mg/ml 2ml | | Lidocaine 2% plain—MPF 5ml |
| | STANDARD SPINE CATH | | Dexamethasone 4mg/ml 5ml | 2 | Lidocaine 2% plain 5ml |
| | IDET EQUIPMENT | | Phenergan 25mg/ml 1ml | | |
| | LONG SPINE CATH | | Ranitidine HCL/ Zantac 50mg 2ml | | Marcaine 0.25% plain 10ml |
| | VIDEO EQUIPMENT | | Ketorolac/ Toradol 30mg/ml 1ml | 1 | Marcaine 0.25% w/epi 50ml |
| 8 | SUTURE PACK | | Ketamine 50mg/ml 10ml | | Marcaine 0.5% plain 10ml |
| | JP DRAIN & BULB | | Cefazolin/ Ancef 1GM IV | | Marcaine 0.5% w/epi 50ml |
| | IRRIGATION FLD 3000ML | | Ampicillin 1 GM IV | | |
| | IRRIGATION FLD 1000ML | | Vancomycin 1GM IV | | Omnipaque 300mg/ml 10ml |
| | GELFOAM | | Levaquin 500 MG IV | | NaCl PF 10ml |
| | BONE WAX | | Gentamycin 80 MG IV | | 2% Hypertonic solution 2ml |
| | THROMBIN 5,000 UNITS | | | | Methylpredisolone 40mg/ml 10ml |
| | BAIR HUGGER | | Ceftriaxone Sodium/ Rocephin 1GM IV | | Dexamethasone 4mg/ml 30ml |
| | FOLEY CATHETER | | Epinephrine 1:1000 1mg/ml 30ml MDV | | Kenalog 40mg/ml 10ml MDV |
| | STRAIGHT CATHETER | | Romazicon 0.1mg/ml 10 ml MDV | | 8.4% Sodium Bicarbonate 50ml |
| | CRUTCHES | | Narcan 0.4mg/ml 1ml | | |

**IMPLANT**

Medtronic 8637-20 | 111 Calibration Constant | SN NGP709721H Serial number

Medtronic 8596SC Intrathecal Catheter Pump Segment Revision Kit
Lot No.: HG3QNRP06

Medtronic 8598A Intrathecal Catheter Spinal Segment Revision Kit
Lot No.: HG3ONFC09

STICKERS
☐ PSI TO BILL FOR EQUIPMENT
☐ 3RD PARTY BILLER TO BILL FOR EQUIPMENT

NON-IMPLANTED ACCESSORY EQUIPMENT
☐CATHETER PASSER
☐LONG STIM OR PUMP NEEDLE
☐LEAD TUNNELER

G-CODE FOR QUALITY CARE REPORTING: ____________
(SEE BACK PAGE FOR G-CODES WITH DESCRIPTIONS)

G[redacted], R[redacted]
DOB: [redacted]

DOS: 02/13/2020
DR. SMITH

# SURGERY SCHEDULING ORDER

PACIFIC SURGICAL INSTITUTE OF PAIN MANAGEMENT
3703 CAMINO DEL RIO SOUTH, STE. 101
SAN DIEGO, CA 92108
(619) 640-1555 PHONE (619) 640-9581 FAX

PSI TO PROVIDE: DATE: 2/13/20 TIME: 0900

LAST NAME: [redacted] FIRST NAME: [redacted] DOB: [redacted] M (X) F ( )

CURRENT WEIGHT: ______

HOME PHONE:( ) ___-____ CELL PHONE:( ) ___-____ ASK PATIENT FOR CURRENT PHONE #

PROCEDURE: pump Implant

SIDE: ______

LEVEL(s) ______

LUMBAR DECOMPRESSION: ENDOSCOPIC TRANSPEDICULAR

TYPE OF ANESTHESIA: (GENERAL) LOCAL IV CONSCIOUS SEDATION IM **CIRCLE ONE**

DIAGNOSIS: Radiculopathy, lumbar region

DX ICD10 CODES: M54.16

PRIMARY INSURANCE: Medicare

AUTH #: Ø

SECONDARY INSURANCE: ______

SPECIAL EQUIPMENT REQUESTED/ VENDOR:

C-arm

# ATTACHMENT 4.

**SD Comprehensive Pain Mgmt Ctr Inc**

3703 Camino del Rio So, 210, San Diego CA 92108 - 4033

Tel: 619 640-5555, Fax: 619 640-5550

**PROGRESS NOTE**

| Patient First Name: | Patient Last Name: | Date of Birth: | Sex: |
|---|---|---|---|
| N | B | | Female |
| **Attending Provider:** | **Referring Provider:** | **Visit Date:** | **Chart No.:** |
| David Smith MD | Maneesh Bawa | 09-19-2020 | SCL00236 |

**Chief Complaint:** Low Back and Leg Pain

**History of Present Illness**

***Low Back and Leg Pain***

The patient complains of pain in the Low back. The patient has been experiencing this pain for more than 10 years. She reports onset of pain gradually over time . The patient describes her pain as constant aching, numbing, shooting, throbbing and stiffness . **The pain radiates to the bilateral lower extremity.** Right now she describes her pain as 5/10 on a pain scale of 0-10. The pain is made worse by increased activity, movement and weather changes. Her pain gets better by taking medications and resting. The patient uses walker as assistive device. For stability

The patient reports today for a refill of her intrathecal pump after having the device implanted today at Pacific Surgical Institute.

**Past Medical History**

Postoperative CSF leak G97.82 (997.09) since 09-30-2020
Encounter for adjustment and management of infusion pump Z45.1 (V53.99) since 05-06-2020
Cervical spinal stenosis M48.02 (723.0) C3-C4, C4-C5, C6-C7 since 07-17-2017
Spondylolisthesis, lumbar region M43.16 (738.4) since 07-17-2017
Rotator cuff tear arthropathy of right shoulder M12.811 (716.81)
Long term current use of opiate analgesic Z79.891 (V58.69) since 09-05-2017
Backache, unspecified M54.9 (724.5) since 01-28-2016
Primary Localized Osteoarthrosis Lower Leg (715.16)
Spinal Stenosis In Cervical Region (723.0) C3-4
Unspec Heredit&idiopathic Peripheral Neuropathy (356.9)
Lumbosacral Spondylosis Without Myelopathy (721.3)
Cervical Spondylosis Without Myelopathy (721.0)
Degeneration Of Cervical Intervertebral Disc (722.4)
Depressive Disorder Not Elsewhere Classified (311)
Insomnia Unspecified (780.52)
Obesity, Unspecified (278.00)
Chondromalacia (733.92)
Carpal Tunnel Syndrome (354.0)
Opioid Type Dependence Unspecified Pattrn Of Use (304.00)
Compression fracture of L2 S32.020A (805.4) since 09-02-2014
Myalgia and myositis M79.1 (729.1) since 02-26-2015
Bulging disc (722.2) L5 S1
Facet joint disease of lumbosacral region M53.9 (724.9)
Post-laminectomy syndrome M96.1 (722.80) lumbar
Lumbar stenosis M48.06 (724.02)
Compression fracture of L1 lumbar vertebra S32.010A (805.4)
Spondylosis of lumbar region without myelopathy or radiculopathy M47.816 (721.3) since 08-05-2016
Vitamin deficiency E56.9 (269.2)
Other fatigue R53.83 (780.79)
Chronic pain syndrome G89.4 (338.4)

Page 2

Lupus M32.9 (710.0)
Lumbosacral spondylosis without myelopathy M47.817 (721.3) since 12-02-2016
Insomnia G47.00 (780.52) since 12-02-2016
Opioid dependence F11.20 (304.00) since 03-16-2017
Adhesive capsulitis M75.00 (726.0)
Right shoulder pain M25.511 (719.41) since 05-19-2017
Subacromial bursitis of right shoulder joint M75.51 (726.19) since 05-19-2017
Chronic lumbar radiculopathy M54.16 (724.4) since 11-09-2017
Radiculopathy of cervical region M54.12 (723.4) since 11-09-2017
Other intervertebral disc degeneration, lumbar region M51.36 (722.52) since 11-09-2017
Failed back surgical syndrome M96.1 (722.80) since 11-09-2017
Facet arthropathy, cervical M46.92 (721.0) since 03-05-2018
Foraminal stenosis of cervical region M99.81 (723.0) since 03-05-2018
Radiculopathy of lumbar region M54.16 (724.4) since 02-21-2019
Long term current use of opiate analgesic Z79.891 (V58.69) since 02-21-2019
Facet arthropathy, lumbar M47.816 (721.3) since 05-24-2019
Spinal stenosis of lumbar region with neurogenic claudication M48.062 (724.03) since 06-06-2019
Tricompartment osteoarthritis of right knee M17.11 (715.96) since 06-06-2019
Facet arthritis, degenerative, cervical spine M47.812 (721.0) since 12-12-2019
Bursitis of left shoulder M75.52 (726.10) since 09-10-2020
Paresthesia R20.2 (782.0) since 09-10-2020
Pre-op testing Z01.818 (V72.84) since 09-15-2020
Contact with and (suspected) exposure to other viral communicable diseases Z20.828 (V01.79) since 09-15-2020
C4-5, C5-6, C6-7 SEVERE STENOSIS W/CORD IMPINGEMENT
CHRONIC L1 COMP FX
HX OF BINGE/PURGE
HX OF INFECTION SEC TO SURGERIES
patellofemoral dysplasia

**Surgical History**

Medtronic Pain Pump Implant: 09/19/2020 by David J. Smith, MD at Pacific Surgical Institute
Medtronic Intrathecal Pump Trial: 05/06/2020 by David J. Smith, MD at Pacific Surgical Institute
Total knee replacement- Left: 10/2013 by Dr. Pete Hanson
Back Surgery: 01/2001
Lumbar Fusion - L2-5 W/PEDICLE SCREWS
Laminectomy - L2-4
Back Surgery
Appendectomy
Tonsillectomy
Cesarean Section
Foot Surgery
Parathyroid surgery
Arthroscopy of Knee
BILAT HAMMER TOE SURGERY;
BACK SURGERY - TUMOR REMOVAL WITH FUSION

**Family History**

Allergy, brother , son, daughter. Anxiety. Arthritis, father, mother, brother , sist. Asthma, father. Cancer, father. Colitis, sister.
congenital heart, father. Depression: self. Diabetes, father. goiter, mother. Hay Fever/Allergies, father, brother. High Blood
Pressure, father, mother, brother, siste. Obesity, mother, brother, sister. rheumatic fever, mother. stomach ulcer, mother.

**Current Medication**

Keflex 500 mg capsule 1 Tablet Four Times A Day
MS Contin 30 mg tablet,extended release 1 Tablet Twice A Day PRN
Norco 10 mg-325 mg tablet 1 Tablet Three Times A Day
amlodipine
B Complex
biotin
Calcium 600

B███████ , N██ Female ████████

Celebrex
Curcumin
Forteo 20mcg 1 injection QD
lisinopril
Plaquenil 200 mg tablet 1 Tablet Once A Day
potassium
ranitidine HCl
Vitamin D3
VIT D 1400MG QD
Omega XL 100 mg QID
Rx for Keflex called in to CVS pharmacy.
Calcium 500 BID
B Complex & C QD

**Allergy**
Adhesive Tape severe rash Allergy . Azathioprine nausea/vomiting Allergy . Dapsone nausea/vomiting Allergy . Demerol Allergy .

**Social History**
**Family:** She is married. She has 2 sons and 1 daughter. She does cardio regularly. PHYSICAL THERAPY, BACK STRENGTHENING She is into a monogamous relationship and heterosexual.
**Use of Drugs/Alcohol/Tobacco:** She denies her alcohol consumption as being problem to self or family or others. Patient states that she drinks alcohol occasionally. Reports drinking wine. She has never smoked tobacco. Smoking Status (MU) never smoker. Patient reports consuming caffeine or caffeinated drinks 1-2 cups a day. She reports using illicit drugs in the past.
**Work History:** She is a retired person. Patient denies any exposure to domestic health hazards.

**Review of Systems**
**Musculoskeletal:** Reports **back pain.**

**Vitals**
**Vital Statistics: Pulse:** 69 per min. **Respiration:** 17breath/min. **BP - Sitting:** 105/73 mmHg. **Pulse Oximetry:** 97%.

**Pain Management**
***Intrathecal Pump Refill***
The patient was brought into the clinic room for analysis with reprogramming and fill by RN or PA, by Shari Corona, RN. The reservoir port to the pump was accessed without complication, using a non-coring 22 guage needle. The pump was then refilled with 20mls of fentanyl and marcaine. Formula: ANYL CITRATE 25MG/ML X 20ML X 1.57 FACTOR=785MG/20ML=FENTANYL BASE 500MG/20ML (7,850 UNITS), Marcaine 5mg/ml X 1 10ml vial. The patient was given a final telemetry to show 20mls. Current rate at 1.401 mg/day mg/day. Alarm date:07/14/2021 ERI: 5-2027. The patient received a priming bolus in the amount of 0.320 ml mg over over 0h 20min hour(s).

Pump fill (09/19/2020)- Fentanyl 25mg/ml (19ml) Marcaine 5mg/ml (2ml)

**Assessment and Plan**
**ICD: Post-laminectomy syndrome (M96.1)**
**ICD: Radiculopathy of lumbar region (M54.16)**
**ICD: Lumbosacral spondylosis without myelopathy (M47.817)**
**ICD: Opioid dependence (F11.20)**
**ICD: Long term current use of opiate analgesic (Z79.891)**
**ICD: Encounter for adjustment and management of infusion pump (Z45.1)**

1. Telemetry/analysis and pump refill performed today. Formula containing Fentanyl and Marcaine was introduced into the intrathecal reservoir. The appropriate concentrations was programmed into the telemetry library. A priming bolus was programmed and patient monitored during the bolus infusion time. The daily rate was initiated at 1.401 mg/day. The patient was discharged with a responsible adult in good condition.
2. The patient was instructed to return in 2 days for post-operative wound check and dressing change. She was instructed to take the ABT as prescribed.

**CPT Codes:**
PUMP REFILL AND REPROGRAMMING (62369)

**HCPC Codes:**
Compounded drug, not otherwise classified (J7999)

**Follow up:** 2 Days

**Education Material Given:**
**Portal:** Sciatica

**Rendering Provider:** David Smith MD

David Smith, MD
*This has been electronically signed by David Smith, MD on 09-19-2020.*

**Session Long Report** **Medtronic**

N[redacted] B[redacted]

Application Version: 1.1.300

Session Date: Sep 19, 2020 8:37 AM

## PATIENT AND SESSION INFORMATION

Last Name : B[redacted]

Birthdate : [redacted]

First Name : N[redacted]

Device : SynchroMed™ II; 8637-20 NGP716707H

Patient ID : - - - - -

Last Update : 9/19/20 11:12 AM

Phone 1 : - - - - -

Address : - - - - -
- - - - - , - - - - - - - - - -
US

Phone 2 : - - - - -

## LOW RESERVOIR ALARM

Refill Pump Before: 7/14/21

Low Reservoir Alarm Volume : 2.0 mL

Next Refill Appointment: - - - - -

## CHANGES MADE

Implant/Replace Pump session workflow. 1 updates occurred. Changes made in:

- Reservoir volume
- Drug Information
- Infusion
- Notes
- Patient
- Prime Bolus
- Catheter
- Low Reservoir Alarm

## ALARM/ALERT OCCURRING

### Beginning of Session

INFORMATION: The pump is in Shelf State.
Pump will be put into Implant Mode after first successful update.
Service Code: 244

## RESERVOIR

Session Long Report

**Medtronic**

Application Version: 1.1.300

Session Date: Sep 19, 2020 8:37 AM

| Title | Beginning of Session | Current Settings |
|---|---|---|
| Reservoir Volume | - - - - - | *20.0 mL* |

DRUGS

| Title | Beginning of Session | Current Settings |
|---|---|---|
| **Primary:** | **Water (1,000.0 mcL/mL)** | ***FENTANYL (23.7 mg/mL)*** |
| Secondary: | - - - - - | *MARCAINE (0.5 mg/mL)* |

Is Patient Receiving Systemic Medication? - - - - -

INFUSION

| Beginning of Session | Current Settings |
|---|---|
| INFORMATION: Pump is in Shelf State. Infusion is set to Minimum Rate (6mcL/day), typically a non-therapeutic dose. | Pump in Implant State. See infusion details below. |

| Beginning of Session | | |
|---|---|---|
| **Monday - Sunday : Minimum Rate** | | |
| **Step** | **Duration** | **Water** |
| Step 1: | 12:00 AM - 12:00 AM<br>24 hr | 6.4 mcL<br>(0.3 mcL/hr) |
| | **24 Hour Dose:** | **6.4 mcL/day** |

| Current Settings | | | |
|---|---|---|---|
| **Monday - Sunday : Simple Continuous** | | | |
| **Step** | **Duration** | **FENTANYL** | MARCAINE |
| Step 1: | 12:00 AM - 12:00 AM<br>24 hr | 1.401 mg<br>(0.058 mg/hr) | 0.02955 mg<br>(0.00123 mg/hr) |
| | **24 Hour Dose:** | **1.401 mg/day** | 0.02955 mg/day |

PRIME BOLUS

Prime Bolus Scheduled.

**Session Long Report** **Medtronic**

N[redacted] B[redacted]

Application Version: 1.1.300

Session Date: Sep 19, 2020 8:37 AM

Volume : 0.320 mL

Duration : 0 hr 20 min

Start Time : 9/19/20 11:12 AM

End Time : 9/19/20 11:32 AM

## ALARMS SETTINGS

Critical Alarm Interval : 0 hr 10 min

Non-Critical Alarm Interval : 1 hr 0 min

## PUMP

| | | | |
|---|---|---|---|
| Pump Model : | 8637-20 | Calibration Constant : | 113.0 |
| Serial Number : | NGP716707H | Reservoir Max Volume : | 20 mL |
| Estimated Replacement : | May 2027 (<81 Months) | Pump Time : | 9/19/20 11:11 AM |

## CATHETER

| | | | |
|---|---|---|---|
| Catheter Model : | Other (two piece) | Implanted Volume : | 0.201 mL |
| Implanted Length : | 91.5 cm | | |
| **Pump Segment** | | **Tip Segment** | |
| Catheter vol/cm : | 0.0022 mL/cm | Catheter vol/cm : | 0.0022 mL/cm |
| Original Length : | 66.0 cm | Original Length : | 38.0 cm |
| Length Removed : | 6.5 cm | Length Removed : | 6.0 cm |
| Implanted Length : | 59.5 cm | Implanted Length : | 32.0 cm |
| Implanted Volume : | 0.131 mL | Implanted Volume : | 0.070 mL |

## NOTES

Two piece
8598A, 8596SC
tip at T9

**END OF REPORT**



Rx only
NDC 55150-169-10
Bupivacaine
HCl Injection, USP
0.5%
50 mg per 10 mL
(5 mg / mL)
For NERVE BLOCK, CAUDAL, and EPIDURAL ANESTHESIA
NOT FOR SPINAL ANESTHESIA
PRESERVATIVE FREE
25 x 10 mL Single Dose Vials
AUROMEDICS

**PATIENT:** B[redacted], N[redacted]

**DOB:** [redacted]

**DOS:** 9.19.2020

---

DAVID J. SMITH, MD
3703 CAMINO DEL RIO S., STE 210,
SAN DIEGO, CA 92108
FENTANYL 25MG/ML 10ML VIAL
DATE: 09/17/2020
EXPIRATION DATE: 10/03/20
MFR LOT: 20A23-BB02-PR00837
BATCH: 229AB
LOT# 09172020_9
NDC# 63275-5100-04
FOR INTRATHECAL USE

X 2 10 ML vials

Marcaine

# ATTACHMENT 5.

**PACIFIC SURGICAL INSTITUTE OF PAIN MANAGEMENT**
**DAVID JAMES SMITH, M.D.**
**3703 Camino del Rio South, Suite 101**
**San Diego, California 92108**
**(619) 640-1555 FAX (619) 640-9581**

Patient: B[redacted], N[redacted]

Date of Procedure: September 19, 2020

## *OPERATIVE PROCEDURE*

PREOPERATIVE DIAGNOSIS: Radiculopathy, lumbar region.

POSTOPERATIVE DIAGNOSIS: Radiculopathy, lumbar region.

OPERATION: 1) Lumbar puncture; 2) thoracolumbosacral myelogram; 3) implantation of Medtronic intrathecal catheter; 4) implantation of Medtronic 20-ml Synchromed II infusion pump; 5) tunneling of catheter from lumbar incision to right lower abdominal quadrant Synchromed Medtronic pump pocket; 6) connection of Medtronic Synchromed infusion pump to connector; 7) anchoring catheter; 8) connection of proximal catheter to Medtronic catheter to Medtronic infusion pump; 9) wound irrigation, lumbar spine and right lower abdominal quadrant; 10) wound closure, lumbar spine and right lower abdominal quadrant region; 11) telemetry analysis and electronic programming of Medtronic 20-ml Synchromed II infusion pump.

ANESTHESIOLOGIST: General anesthesia administered by Dr. Donald Rose.

COMPLICATIONS: None.

BLOOD LOSS: Minimal

PROCEDURE: After all risks and benefits were explained to the patient including the risk of death, bleeding, infection, and paralysis, and after informed consent was obtained, the patient was brought into the preoperative area where a peripheral IV was started. The anesthesiologist consulted with the patient. The patient was brought into the surgical suite and placed in a right lateral decubitus position.

Diplomate, American Board of Physical Medicine and Rehabilitation
Diplomate, American Academy of Pain Medicine
Associate, American Board of Electrodiagnostic Testing
Agreed Medical Examiner, State of California

Anesthesia was induced. Refer to anesthesia record for continued medication administration.

The patient was then prepped and draped in the normal fashion. The fluoroscopic beam was brought to the operating room field, and cross-table fluoroscopic visualization was utilized to locate the L4-L5 level. Using sterile technique, the area at L4-L5 was marked with non-removable ink.

A 5.5 inch Medtronic 15-gauge obturator and trocar with beveled tip was brought to the operating field. The marked area was entered through the skin and deep subcutaneous layers and intramuscularis layers. Fluoroscopic pictures showed the tip of the needle entering the L4-L5 ligamentum flavum. The needle was advanced, and the trocar was removed. Clear cerebrospinal fluid exited from the proximal tip of the trocar. Fluoroscopic visualization demonstrated the distal tip of the trocar was subarachnoid.

The catheter was then advanced under fluoroscopy through the trocar and into the subarachnoid space. The tip was cephalad in the subarachnoid space to the L4-L5 level. The stylet was removed without complication.

A needle and syringe containing Omnipaque (300 mg/ml) was brought to the field, and approximately 3 ml of Omnipaque (300 mg/ml) was injected through the Medtronic catheter. Fluoroscopic visualization was then performed, demonstrating a thoracolumbosacral myelogram, confirming subarachnoid placement.

The needle was left in the catheter, and the syringe was changed from Omnipaque to preservative-free normal saline. At this time, preservative-free normal saline was then injected through the catheter to clear the catheter of Omnipaque

The needle was removed from the catheter, and the catheter was secured with a hemostat to the sterile drape. The catheter remained in the trocar and the intrathecal space with the most proximal end of the catheter attached to the sterile drape via hemostat in anticipation of being placed in the aluminum tunneler. Approximately 20 ml of 0.5% Marcaine 1:200,000 were used to anesthetize the incision site. Then a #10 blade was utilized to create a 2-inch incision from cephalad to caudal. The incision was made deep, down approximately one inch from the interspinous ligament, which was palpable. Bleeding was controlled at all times using Bovie coagulation.

The trocar was then removed and the anchor brought down around the catheter and placed upon the deep interspinous ligament. Using 0 Ethibond in the standard fashion, the

anchor was secured to the interspinous ligament. The catheter integrity was checked and was non-mobile and secured using the Medtronic anchor. Two additional retaining sutures were placed just proximal to the anchor site using 0 Ethibond to prevent the anchor from angulating away from the anterior wound floor. This allowed the anchor to remain flush all points across the wound floor. The abdominal region was then approached for creation of a pump pocket in the right lower abdominal quadrant. The appropriate location for implantation of the pump was marked with a marker. This was approximately 3 inches in length.

Approximately 20 ml of 0.5% Marcaine 1:200,000 were used to anesthetize the incision site. Using a #10 blade, a 3.5-inch incision was made. Bleeding was controlled at all times using Bovie coagulation.

The incision was further deepened using the cut mode of Bovie. Bleeding was controlled at all times using Bovie coagulation. There was ample adipose tissue which was trimmed. The pocket was further refined using digital dissection. Once the pocket was secured, it was inspected for bleeding. There was no evidence of any significant bleeding.

At this point, the lumbar incision was cleaned and dried as was the abdominal incision.

Using the aluminum tunneler provided by Medtronic, this was contoured to the body and it was inserted through the pump pocket in the right lower quadrant. It was guided above the skin and directed to the lumbar incision.

This exited the lumbar incision approximately 1 inch cephalad to the Medtronic trocar containing the catheter still in place. The center guide was removed from the aluminum tunneler. The catheter was then feed through the lumen of the tunneler. This was done without complications. The tunneler was then removed from the subcutaneous tract leaving the catheter subcutaneous and exiting in the pump pocket site of the right lower quadrant.

The excess catheter had been cut and removed from the field for catheter lumen volume measurement and calculation for a Medtronic priming bolus dose. The pump had previously been purged and had been initially programmed and analyzed. At this point, the pump was brought to the field. The pump was programmed by the Medtronic representative.

Using the standard technique, the catheter was attached to the pump. The integrity of this connection was tested and there was an attempt to distract and remove the catheter from

RE: B[redacted], N[redacted]

September 19, 2020
Page Four

the connector and the connector from the pump. Once this was determined to be secure in its connection, the pump was placed in the pocket with the side access port at the 9 o'clock position. .

With the pump securely in the pocket, attention was directed to securing the pump to the deep abdominal fascia. Using 0 Ethibond sutures with careful attention not to pierce the existing catheter, the suture was passed through the abdominal fascia and then through the eyelet of the pump. Three eyelets were used, one at the 3 o'clock, one at the 6 o'clock, and one at the 9 o'clock position. Each 0 Ethibond suture was secured in the usual fashion after passage through the abdominal fascia and the respective eyelet of the pump. This prevented the pump from effectively rotating or flipping.

A total of 1,000 ml of normal saline containing 1 g of reconstituted Ancef was used, and the pocket was irrigated with 500 ml of normal saline containing Ancef. The other 500 ml were utilized to irrigate the lumbar incision.

The pocket was closed with 0 Vicryl interrupted sutures, followed by 2-0 Vicryl interrupted sutures, followed by skin staples. The back wound was closed with 0 Vicryl interrupted sutures, followed by 2-0 Vicryl interrupted sutures, and skin staples. Compression dressings were applied. The patient was placed in an abdominal binder.

The patient was stable. The procedure was complete. The patient was transferred to the PACU.

[signature] 9/19/20 County of San Diego
David James Smith, M.D. Date Board Certified

DJS/na
DD: 09/19/20
DT: 09/19/20

Diplomate, American Board of Physical Medicine and Rehabilitation
Diplomate, American Academy of Pain Medicine
Associate, American Board of Electrodiagnostic Testing
Agreed Medical Examiner, State of California

PACIFIC SURGICAL INSTITUTE OF PAIN MANAGEMENT, 3703 CAMINO DEL RIO SO, STE 101, SD, CA, 92108

| COUNT N/A | INITIAL COUNT | PERITONEAL COUNT | FINAL COUNT |
|---|---|---|---|
| LAP SPONGES | 5 | | 5 |
| ~~RAYTEX~~ BOVI | 1 | | 1 |
| SUTURE NEEDLES | 7 | | 7 |
| BLADES | 1 | | 1 |
| NEEDLES | 4 | | 4 |

MEDICATIONS: WT: 204 AGE: 72

| AGENT: ⇩ TIME: ⇨ | | | | | | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| OXYGEN (lpm) | | | | | | | | | | | |
| DEMEROL (MG) IV | | | | | | | | | | | |
| DILAUDID (MG) IV/IM | | | | | | | | | | | |
| VERSED (MG) IV | | | | | | | | | | | |
| FENTANYL (MCG) IV | | | | | | | | | | | |
| ANCEF (GM) IV | | | | | | | | | | | |
| OTHER | | | | | | | | | | | |

SEE ANESTHESIA RECORD

**PROCEDURE MEDICATIONS:**

LIDO ___ % ___ MPF ___ W/EPI ___ ML MARCAINE 20 ML 0.25% ___ 0.5%: ✓ W/EPI ___ PLAIN ___ ML

OMNIPAQUE: 5 ML KENALOG 40MG/ML ' ML PF NaCl 10 ML DEXAMETHASONE ___ ML

METHYL-P 40MG/ML ___ ML TORADOL 30MG/ML ___ ML

| TIME | BP | CARDIAC RHYTHM | 02 SAT | RESP | LOC ** |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

SEE ANESTHESIA RECORD

2 Awake and oriented
1 Arousable with minimal stimulation
0 Responsive only to tactile stimulation

NOTES/NURSING CONCERNS:
P25(19), MA5(2) · Rate 1.4 mg/day

Medtronic 8596SC Intrathecal Catheter Pump Segment Revision Kit
Lot No.: HG4AJV001

IMPLANT STICKERS:
Medtronic 8598A Intrathecal Catheter Spinal Segment Revision Kit
Lot No.: HG4GWDF01

8591 38 Lot# 0220419177

Medtronic 8637-20 113 Calibration Constant SN NGP716707H Serial number

0.5% Marc (w/epi 1:200,000) 2 ml

Omni: 2-4 ml NaCl: 6-7 ml

Entered @ (R) LQ

Leads span: ___

Catheter tip @ ___

IPG/PUMP placed on (RT) / LT. Side Access @ ___

DISCHARGED/OR at: 1115 AMBULATING W/O ASSIST: ✓ PAIN LEVEL: /10

TRANSFER/PACU at: 1115 VIA GURNEY. LOC: ✓ A&OX4 ___ REACTIVE/SLEEPY ___ NON RESPONSIVE

TRANSFERRED W/ ___ MD [signature] RN

RN SIGNATURE: [signature] DATE/TIME: 09·19·2020

B[redacted], N[redacted] DOS: 09-19-2020
DR. SMITH

PACIFIC SURGICAL INSTITUTE OF PAIN MANAGEMENT, 3703 CAMINO DEL RIO SO, STE 101, SD, CA, 92108

# PACU RECORD:

TIME IN: 1115 RECOVERY ROOM NURSE: McKenna Smith

ALLERGIES: Mycophenolate, Demerol, Azathioprine, Dapsone

ANESTHESIA PROVIDER: Dr. Rose ANESTHESIA TYPE: General TO PACU VIA: ✓ GURNEY __ W/C __ AMB

PROCEDURE: Right intrathecal pain pump implant

INITIAL ASSESSMENT:
COLOR: (PINK) PALE DUSKY RUDDY
DRESSING: (DRY/INTACT) DRAINIAGE N/A
SKIN: (WARM/DRY) COLD/CLAMMY
LOC: DROWSY (REACTIVE/AWAKE) RESTLESS

RESPIRATIONS: (REG/UNLABORED) IRREG/SHALLOW
AIRWAY: O2 2L lpm MASK (NASAL CANNULA) N/A
OXYGEN D/C at: 1205

IV ASSESSMENT: (HEALTHY/NO REDDNESS) INFILTRATED/REDDENED
SITE: (R) hand GAUGE: 22
IV DC AT: 1240 CATH INTACT: ✓ SITE CLEAR: ✓

INTAKE/OR: 850 ML INTAKE/PACU: 350 ML
TOTAL FLUIDS: 1200 ML EBL: 20mL
TOTAL OUTPUT: — ML TYPE: LR & NS

FUNCTIONAL PAIN LEVEL: 0/10

*VITAL SIGNS:*

| TIME | BLOOD PRESSURE | RESP | SaO2 | TEMP | PULSE | PAIN |
|---|---|---|---|---|---|---|
| ARRIVAL | 155/62 | 12 N.T. | 94 | 97.2 | 77 N.T. | 0/10 |
| 1120 | 186/93 | 12 | 91 | — | 79 | 2/10 |
| 1125 | 150/74 | 18 | 98 | — | 95 | 2/10 |
| 1130 | 170/81 | 24 | 98 | — | 85 | 2/10 |
| 1135 | 191/92 | 10 | 98 | — | 83 | 7/10 |
| 1140 | 187/47 | 20 | 98 | — | 79 | 5/10 |
| 1145 | 174/84 | | | | | |

@1125 put 2L of O2 via NC

(ADDITIONAL VITAL SIGNS RECORD ON REVERSE)

*MEDICATIONS:*

| TIME | MEDICATION | DOSE | PAIN SCALE | INIT. |
|---|---|---|---|---|
| 1140 | Fentanyl | 25mcg | 7/10 | M.S. |
| | | | | |
| | | | | |
| | | | | |

*DISCHARGE ASSESSMENT:*
COLOR: (PINK) PALE DUSKY RUDDY SKIN: (WARM/DRY) COLD/CLAMMY
LOC: DROWSY (REACTIVE/AWAKE) RESTLESS N/V:
DRSG: (DRY/INTACT) DRAINAGE N/A
PAIN: NONE (MILD (1-4)) MOD (5-7) SEVERE (8-10)
POST OP INST. TO __ PT ✓ FAMILY
BELONGINGS GIVEN TO: ✓ PT __ FAMILY
DISCHARGE CONDITION: ✓ STABLE
DISCHARGE TIME: 1311 WITH: sister

| ALDRETE SCORE | | ADM | 15" | 30" | D/C |
|---|---|---|---|---|---|
| Able to move 4 extremities / Able to move 2 extremities / Able to move 0 extremities | 2 / 1 / 0 | 1 | 1 | 2 | 2 |
| Able to deep breath and cough / Dyspnea or limited breathing | 2 / 1 | 2 | 2 | 2 | 2 |
| B/P +/- 25% pre-anesthesia level / +/- 25-50% / +/- 50% | 2 / 1 / 0 | 1 | 2 | 2 | 2 |
| Awake and Oriented / Arousable on call / None responsive | 2 / 1 / 0 | 2 | 2 | 2 | 2 |
| Normal color / Pale, Dusky, Blotchy, Jaundice / Cyanotic | 2 / 1 / 0 | 2 | 2 | 2 | 2 |
| Post Anesthesia Score (Must be 8-10 to be discharged) | | 8 | 9 | 10 | 10 |

NOTES:

MD EVALUATION & DISCHARGE: ALL DISCHARGE CRITERIA HAVE BEEN MET AND PT MAY BE DISCHARGED PER FACILITY POLICY.

MD SIGNATURE: [signature] DATE/TIME 09·19·2020

RN SIGNATURE: [signature] DATE/TIME 09·19·2020 @ 1311

B[redacted], N[redacted] DOS: 09-19-2020